# WILLIAMSON COUNTY REGIONAL PLANNING COMMISSION ET AL. *v.* HAMILTON BANK OF JOHNSON CITY

No. 84–4.   Argued February 19, 1985—Decided June 28, 1985

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a concurring opinion, in which MARSHALL, J., joined, *post*, p. 201. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 202. WHITE, J., filed a dissenting statement, *post*, p. 200. POWELL, J., took no part in the decision of the case.

*Robert L. Estes* argued the cause for petitioners. With him on the brief was *M. Milton Sweeney.*

*Edwin S. Kneedler* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne,* and *David C. Shilton.*

*G. T. Nebel* argued the cause for respondent. With him on the brief was *Gus Bauman.*\*

---

*Briefs of *amici curiae* urging reversal were filed for the State of California ex rel. John K. Van de Kamp, Attorney General of California, et al. by Mr. Van de Kamp, *pro se, N. Gregory Taylor* and *Theodora Berger,* Assistant Attorneys General of California, *Richard C. Jacobs, Craig C. Thompson, Richard M. Frank, Norman C. Gorsuch,* Attorney General of Alaska, *Jim Smith,* Attorney General of Florida, *Thomas J. Miller,* Attorney General of Iowa, *Francis X. Bellotti,* Attorney General of Massachusetts, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Paul L. Douglas,* Attorney General of Nebraska, *Brian McKay,* Attorney General of Nevada, *George V. Postrozny,* Deputy Attorney General, *Gregory H. Smith,* Attorney General of New Hampshire, *T. Travis Medlock,* Attorney General of South Carolina, *Jim Mattox,* Attorney General of Texas, *Rufus L. Edmisten,* Attorney General of North Carolina, *Michael Turpen,* Attorney General of Oklahoma, *Robert L. McDonald,* First Assistant Attorney General, *Mark V. Meierhenry,* Attorney General of South Dakota, *David L. Wilkinson,* Attorney General of Utah, *Dallis W. Jensen,* Solicitor General, *John J. Easton,* Attorney General of Vermont, *Bronson C. La Follette,* Attorney General of Wisconsin, *Archie G. McClintock,* Attorney General of Wyoming, *Aviata F. Fa'Alevao,* Attorney General of American Samoa; for the National Association of Counties et al. by *Lawrence R. Velvel* and *Joyce Holmes Benjamin;* for the City of New

JUSTICE BLACKMUN delivered the opinion of the Court.

Respondent, the owner of a tract of land it was developing as a residential subdivision, sued petitioners, the Williamson County (Tennessee) Regional Planning Commission and its members and staff, in United States District Court, alleging that petitioners' application of various zoning laws and regulations to respondent's property amounted to a "taking" of that property. At trial, the jury agreed and awarded respondent $350,000 as just compensation for the "taking." Although the jury's verdict was rejected by the District Court, which granted a judgment notwithstanding the verdict to petitioners, the verdict was reinstated on appeal. Petitioners and their *amici* urge this Court to overturn the jury's award on the ground that a temporary regulatory interference with an investor's profit expectation does not constitute a "taking" within the meaning of the Just Compensation Clause of the Fifth Amendment,[1] or, alternatively, on the ground that even if such interference does constitute a taking, the Just Compensation Clause does not require money damages as recompense. Before we reach those con-

---

York by *Frederick A. O. Schwarz, Jr.*, and *Leonard Koerner;* and for the City of St. Petersburg, Florida, by *Charles L. Siemon, Wendy U. Larsen,* and *Michael S. Davis.*

Briefs of *amici curiae* urging affirmance were filed for the American College of Real Estate Lawyers by *Edward I. Cutler, Eugene J. Morris,* and *John P. Trevaskis, Jr.;* for the California Building Industry Association by *Gideon Kanner;* for the National Apartment Association by *Jon D. Smock* and *Wilbur H. Haines III;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robert K. Best.*

*Morris A. Thurston, Robert K. Break,* and *John L. Fellows III* filed a brief for Irvine Co. as *amicus curiae.*

[1] "[N]or shall private property be taken for public use, without just compensation."

The Fifth Amendment's prohibition, of course, applies against the States through the Fourteenth Amendment. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 241 (1897); see also *San Diego Gas & Electric Co.* v. *San Diego,* 450 U. S. 621, 623, n. 1 (1981).

tentions, we examine the procedural posture of respondent's claim.

## I

## A

Under Tennessee law, responsibility for land-use planning is divided between the legislative body of each of the State's counties and regional and municipal "planning commissions." The county legislative body is responsible for zoning ordinances to regulate the uses to which particular land and buildings may be put, and to control the density of population and the location and dimensions of buildings. Tenn. Code Ann. § 13–7–101 (1980). The planning commissions are responsible for more specific regulations governing the subdivision of land within their region or municipality for residential development. §§ 13–3–403, 13–4–303. Enforcement of both the zoning ordinances and the subdivision regulations is accomplished in part through a requirement that the planning commission approve the plat of a subdivision before the plat may be recorded. §§ 13–3–402, 13–4–302 (1980 and Supp. 1984).

Pursuant to § 13–7–101, the Williamson County "Quarterly Court," which is the county's legislative body, in 1973 adopted a zoning ordinance that allowed "cluster" development of residential areas. Under "cluster" zoning,

"both the size and the width of individual residential lots in . . . [a] development may be reduced, provided . . . that the overall density of the entire tract remains constant—provided, that is, that an area equivalent to the total of the areas thus 'saved' from each individual lot is pooled and retained as common open space." 2 N. Williams, American Land Planning Law § 47.01, pp. 212–213 (1974).

Cluster zoning thus allows housing units to be grouped, or "clustered" together, rather than being evenly spaced on uniform lots.

As required by § 13–3–402, respondent's predecessor-in-interest (developer) in 1973 submitted a preliminary plat for the cluster development of its tract, the Temple Hills Country Club Estates (Temple Hills), to the Williamson County Regional Planning Commission for approval. At that time, the county's zoning ordinance and the Commission's subdivision regulations required developers to seek review and approval of subdivision plats in two steps. The developer first was to submit for approval a preliminary plat, or "initial sketch plan," indicating, among other things, the boundaries and acreage of the site, the number of dwelling units and their basic design, the location of existing and proposed roads, structures, lots, utility layouts, and open space, and the contour of the land. App. in No. 82–5388 (CA6), pp. 857, 871 (CA App.). Once approved, the preliminary plat served as a basis for the preparation of a final plat. Under the Commission's regulations, however, approval of a preliminary plat "will not constitute acceptance of the final plat." *Id.*, at 872. Approval of a preliminary plat lapsed if a final plat was not submitted within one year of the date of the approval, unless the Commission granted an extension of time, or unless the approval of the preliminary plat was renewed. *Ibid.* The final plat, which is the official authenticated document that is recorded, was required to conform substantially to the preliminary plat, and, in addition, to include such details as the lines of all streets, lots, boundaries, and building setbacks. *Id.*, at 875.

On May 3, 1973, the Commission approved the developer's preliminary plat for Temple Hills. App. 246–247. The plat indicated that the development was to include 676 acres, of which 260 acres would be open space, primarily in the form of a golf course. *Id.*, at 422. A notation on the plat indicated that the number of "allowable dwelling units for total development" was 736, but lot lines were drawn in for only 469 units. The areas in which the remaining 276 units were to be placed were left blank and bore the notation "this parcel not to be developed until approved by the planning commission."

The plat also contained a disclaimer that "parcels with note 'this parcel not to be developed until approved by the planning commission' not a part of this plat and not included in gross area." *Ibid.* The density of 736 allowable dwelling units was calculated by multiplying the number of acres (676) by the number of units allowed per acre (1.089). *Id.*, at 361. Although the zoning regulations in effect in 1973 required that density be calculated "on the basis of total acreage less fifty percent (50%) of the land lying in the flood plain . . . and less fifty percent (50%) of all land lying on a slope with a grade in excess of twenty-five percent (25%)," CA App. 858, no deduction was made from the 676 acres for such land. Tr. 369.

Upon approval of the preliminary plat, the developer conveyed to the county a permanent open space easement for the golf course, and began building roads and installing utility lines for the project. App. 259–260. The developer spent approximately $3 million building the golf course, and another $500,000 installing sewer and water facilities. Defendant's Ex. 96. Before housing construction was to begin on a particular section, a final plat of that section was submitted for approval. Several sections, containing a total of 212 units, were given final approval by 1979. App. 260, 270, 278, 423. The preliminary plat, as well, was reapproved four times during that period. *Id.*, at 270, 274, 362, 423.

In 1977, the county changed its zoning ordinance to require that calculations of allowable density exclude 10% of the total acreage to account for roads and utilities. *Id.*, at 363; CA App. 862. In addition, the number of allowable units was changed to one per acre from the 1.089 per acre allowed in 1973. *Id.*, at 858, 862; Tr. 1169–1170, 1183. The Commission continued to apply the zoning ordinance and subdivision regulations in effect in 1973 to Temple Hills, however, and reapproved the preliminary plat in 1978. In August 1979, the Commission reversed its position and decided that plats submitted for renewal should be evaluated under the zoning

ordinance and subdivision regulations in effect when the renewal was sought. App. 279–282. The Commission then renewed the Temple Hills plat under the ordinances and regulations in effect at that time. *Id.*, at 283–284.

In January 1980, the Commission asked the developer to submit a revised preliminary plat before it sought final approval for the remaining sections of the subdivision. The Commission reasoned that this was necessary because the original preliminary plat contained a number of surveying errors, the land available in the subdivision had been decreased inasmuch as the State had condemned part of the land for a parkway, and the areas marked "reserved for future development" had never been platted. Plaintiff's Exs. 1078 and 1079; Tr. 164–168. A special committee (Temple Hills Committee) was appointed to work with the developer on the revision of the preliminary plat. Plaintiff's Ex. 1081; Tr. 169–170.

The developer submitted a revised preliminary plat for approval in October 1980.[2] Upon review, the Commission's staff and the Temple Hills Committee noted several problems with the revised plat. App. 304–305. First, the allowable density under the zoning ordinance and subdivision regulations then in effect was 548 units, rather than the 736 units claimed under the preliminary plat approved in 1973. The difference reflected a decrease in 18.5 acres for the parkway, a decrease of 66 acres for the 10% deduction for roads, and an exclusion of 44 acres for 50% of the land lying on slopes exceeding a 25% grade. Second, two cul-de-sac roads that had become necessary because of the land taken for the parkway exceeded the maximum length allowed for such roads under the subdivision regulations in effect in both 1980 and 1973.

---

[2] The developer also submitted the preliminary plat that had been approved in 1973 and reapproved on several subsequent occasions, contending that it had the right to develop the property according to that plat. As we have noted, that plat did not indicate how all of the parcels would be developed. App. 84–85.

Third, approximately 2,000 feet of road would have grades in excess of the maximum allowed by county road regulations. Fourth, the preliminary plat placed units on land that had grades in excess of 25% and thus was considered undevelopable under the zoning ordinance and subdivision regulations. Fifth, the developer had not fulfilled its obligations regarding the construction and maintenance of the main access road. Sixth, there were inadequate fire protection services for the area, as well as inadequate open space for children's recreational activities. Finally, the lots proposed in the preliminary plat had a road frontage that was below the minimum required by the subdivision regulations in effect in 1980.

The Temple Hills Committee recommended that the Commission grant a waiver of the regulations regarding the length of the cul-de-sacs, the maximum grade of the roads, and the minimum frontage requirement. *Id.,* at 297, 304–306. Without addressing the suggestion that those three requirements be waived, the Commission disapproved the plat on two other grounds: first, the plat did not comply with the density requirements of the zoning ordinance or subdivision regulations, because no deduction had been made for the land taken for the parkway, and because there had been no deduction for 10% of the acreage attributable to roads or for 50% of the land having a slope of more than 25%; and second, lots were placed on slopes with a grade greater than 25%. Plaintiff's Ex. 9112.

The developer then appealed to the County Board of Zoning Appeals for an "interpretation of the Residential Cluster zoning [ordinance] as it relates to Temple Hills."[3] App. 314.

---

[3] The Board of Zoning Appeals was empowered:

"a. To hear and decide appeals on any permit, decision, determination, or refusal made by the [County] Building Commissioner or other administrative official in the carrying out or enforcement of any provision of this Resolution; and to interpret the Zoning map and this Resolution.

.      .      .      .      .

"c. To hear and decide applications for variances from the terms of this Resolution. Such variances shall be granted only where by reason of ex-

On November 11, 1980, the Board determined that the Commission should apply the zoning ordinance and subdivision regulations that were in effect in 1973 in evaluating the density of Temple Hills. *Id.*, at 328. It also decided that in measuring which lots had excessive grades, the Commission should define the slope in a manner more favorable to the developer. *Id.*, at 329.

On November 26, respondent, Hamilton Bank of Johnson City, acquired through foreclosure the property in the Temple Hills subdivision that had not yet been developed, a total of 257.65 acres. *Id.*, at 189–190. This included many of the parcels that had been left blank in the preliminary plat approved in 1973. In June 1981, respondent submitted two preliminary plats to the Commission—the plat that had been approved in 1973 and subsequently reapproved several times, and a plat indicating respondent's plans for the undeveloped areas, which was similar to the plat submitted by the developer in 1980. *Id.*, at 88. The new plat proposed the development of 688 units; the reduction from 736 units represented respondent's concession that 18.5 acres should be removed from the acreage because that land had been taken for the parkway. *Id.*, at 424, 425.

On June 18, the Commission disapproved the plat for eight reasons, including the density and grade problems cited in the October 1980 denial, as well as the objections the Temple Hills Committee had raised in 1980 to the length of two cul-de-sacs, the grade of various roads, the lack of fire protection, the disrepair of the main-access road, and the minimum frontage. *Id.*, at 370. The Commission declined to follow the decision of the Board of Zoning Appeals that the plat

ceptional narrowness, shallowness, or shape of a specific piece of property which at the time of adoption of this Resolution was a lot of record, or where by reason of exceptional topographic situations or conditions of a piece of property the strict application of the provisions of this Resolution would result in practical difficulties to or undue hardship upon the owner of such property." Plaintiff's Ex. 9112.

See also Tenn. Code. Ann. §§ 13–7–106 to 13–7–109 (1980).

should be evaluated by the 1973 zoning ordinance and sub-division regulations, stating that the Board lacked jurisdiction to hear appeals from the Commission. *Id.*, at 187–188, 360–361.

B

Respondent then filed this suit in the United States District Court for the Middle District of Tennessee, pursuant to 42 U. S. C. § 1983, alleging that the Commission had taken its property without just compensation and asserting that the Commission should be estopped under state law from denying approval of the project.[4] Respondent's expert witnesses testified that the design that would meet each of the Commission's eight objections would allow respondent to build only 67 units, 409 fewer than respondent claims it is entitled to build,[5] and that the development of only 67 sites would result in a net loss of over $1 million. App. 377. Petitioners' expert witness, on the other hand, testified that the Commission's eight objections could be overcome by a design that would allow development of approximately 300 units. Tr. 1467–1468.

After a 3-week trial, the jury found that respondent had been denied the "economically viable" use of its property in violation of the Just Compensation Clause, and that the Commission was estopped under state law from requiring respondent to comply with the current zoning ordinance and

---

[4] Respondent also alleged that the Commission's refusal to approve the plat violated respondent's rights to substantive and procedural due process and denied it equal protection. The District Court granted a directed verdict to petitioners on the substantive due process and equal protection claims, and the jury found that respondent had not been denied procedural due process. App. 32. Those issues are not before us.

[5] *Id.*, at 377; Tr. 238–243. Respondent claimed it was entitled to build 476 units: the 736 units allegedly approved in 1973 minus the 212 units already built or given final approval and minus 48 units that were no longer available because land had been taken from the subdivision for the parkway.

subdivision regulations rather than those in effect in 1973. App. 32–33. The jury awarded damages of $350,000 for the temporary taking of respondent's property. *Id.*, at 33–34.[6] The court entered a permanent injunction requiring the Commission to apply the zoning ordinance and subdivision regulations in effect in 1973 to Temple Hills, and to approve the plat submitted in 1981. *Id.*, at 34.

The court then granted judgment notwithstanding the verdict in favor of the Commission on the taking claim, reasoning in part that respondent was unable to derive economic benefit from its property on a temporary basis only, and that such a temporary deprivation, as a matter of law, cannot constitute a taking. *Id.*, at 36, 41. In addition, the court modified its permanent injunction to require the Commission merely to apply the zoning ordinance and subdivision regulations in effect in 1973 to the project, rather than requiring approval of the plat, in order to allow the parties to resolve "legitimate technical questions of whether plaintiff meets the requirements of the 1973 regulations," *id.*, at 42, through the applicable state and local appeals procedures.[7]

A divided panel of the United States Court of Appeals for the Sixth Circuit reversed. 729 F. 2d 402 (1984). The court

---

[6] Although the record is less than clear, it appears that the jury calculated the $350,000 award by determining a fair rate of return on the value of the property for the time between the Commission's rejection of the preliminary plat in 1980 and the jury's verdict in March 1982. See *id.*, at 800–805; Tr. of Oral Arg. 25, 32–33. In light of our disposition of the case, we need not reach the question whether that measure of damages would provide just compensation, or whether it would be appropriate if respondent's cause of action were viewed as stating a claim under the Due Process Clause.

[7] While respondent's appeal was pending before the Court of Appeals, the parties reached an agreement whereby the Commission granted a variance from its cul-de-sac and road-grade regulations and approved the development of 476 units, and respondent agreed, among other things, to rebuild existing roads, and build all new roads, according to current regulations. App. to Brief for Petitioners 35.

held that application of government regulations affecting an owner's use of property may constitute a taking if the regulation denies the owner all "economically viable" use of the land, and that the evidence supported the jury's finding that the property had no economically feasible use during the time between the Commission's refusal to approve the preliminary plat and the jury's verdict. *Id.*, at 405–406. Rejecting petitioners' argument that respondent never had submitted a plat that complied with the 1973 regulations, and thus never had acquired rights that could be taken, the court held that the jury's estoppel verdict indicates that the jury must have found that respondent had acquired a "vested right" under state law to develop the subdivision according to the plat submitted in 1973. *Id.*, at 407. Even if respondent had no vested right under state law to finish the development, the jury was entitled to find that respondent had a reasonable investment-backed expectation that the development could be completed, and that the actions of the Commission interfered with that expectation. *Ibid.*

The court rejected the District Court's holding that the taking verdict could not stand as a matter of law. A temporary denial of property could be a taking, and was to be analyzed in the same manner as a permanent taking. Finally, relying upon the dissent in *San Diego Gas & Electric Co.* v. *San Diego*, 450 U. S. 621, 636 (1981), the court determined that damages are required to compensate for a temporary taking.[8]

---

[8] Judge Wellford dissented. 729 F. 2d, at 409. He did not agree that the evidence supported a finding that respondent's property had been taken, in part because there was no evidence that respondent had formally requested a variance from the regulations. Even if there was a temporary denial of the "economically viable" use of the property, Judge Wellford would have held that mere fluctuations in value during the process of governmental decisionmaking are " 'incidents of ownership' " and cannot be considered a " 'taking,' " *id.*, at 410, quoting *Agins* v. *Tiburon*, 447 U. S. 255, 263, n. 9 (1980). He also did not agree that damages could be awarded to remedy any taking, reasoning that the *San Diego Gas* dissent

## II

We granted certiorari to address the question whether Federal, State, and local Governments must pay money damages to a landowner whose property allegedly has been "taken" temporarily by the application of government regulations. 469 U. S. 815 (1984). Petitioners and their *amici* contend that we should answer the question in the negative by ruling that government regulation can never effect a "taking" within the meaning of the Fifth Amendment. They recognize that government regulation may be so restrictive that it denies a property owner all reasonable beneficial use of its property, and thus has the same effect as an appropriation of the property for public use, which concededly would be a taking under the Fifth Amendment. According to petitioners, however, regulation that has such an effect should not be viewed as a taking. Instead, such regulation should be viewed as a violation of the Fourteenth Amendment's Due Process Clause, because it is an attempt by government to use its police power to effect a result that is so unduly oppressive to the property owner that it constitutionally can be effected only through the power of eminent domain. Violations of the Due Process Clause, petitioners' argument concludes, need not be remedied by "just compensation."

The Court twice has left this issue undecided. *San Diego Gas & Electric Co.* v. *San Diego, supra; Agins* v. *Tiburon*, 447 U. S. 255, 263 (1980). Once again, we find that the question is not properly presented, and must be left for another day. For whether we examine the Planning Commission's application of its regulations under Fifth Amendment "taking" jurisprudence, or under the precept of due process, we conclude that respondent's claim is premature.

---

does not reflect the views of the majority of this Court, and that this Court never has awarded damages for a temporary taking where there was no invasion, physical occupation, or "seizure and direction" by the State of the landowner's property. 729 F. 2d, at 411.

## III

We examine the posture of respondent's cause of action first by viewing it as stating a claim under the Just Compensation Clause. This Court often has referred to regulation that "goes too far," *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922), as a "taking." See, *e. g.*, *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1004–1005 (1984); *Agins* v. *Tiburon*, 447 U. S., at 260; *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 83 (1980); *Kaiser Aetna* v. *United States*, 444 U. S. 164, 174 (1979); *Andrus* v. *Allard*, 444 U. S. 51, 65–66 (1979); *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 124 (1978); *Goldblatt* v. *Hempstead*, 369 U. S. 590, 594 (1962); *United States* v. *Central Eureka Mining Co.*, 357 U. S. 155, 168 (1958). Even assuming that those decisions meant to refer literally to the Taking Clause of the Fifth Amendment, and therefore stand for the proposition that regulation may effect a taking for which the Fifth Amendment requires just compensation, see *San Diego*, 450 U. S., at 647–653 (dissenting opinion), and even assuming further that the Fifth Amendment requires the payment of money damages to compensate for such a taking, the jury verdict in this case cannot be upheld. Because respondent has not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation, respondent's claim is not ripe.

### A

As the Court has made clear in several recent decisions, a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue. In *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264

(1981), for example, the Court rejected a claim that the Surface Mining Control and Reclamation Act of 1977, 91 Stat. 447, 30 U. S. C. § 1201 *et seq.*, effected a taking because:

"There is no indication in the record that appellees have availed themselves of the opportunities provided by the Act to obtain administrative relief by requesting either a variance from the approximate-original-contour requirement of § 515(d) or a waiver from the surface mining restrictions in § 522(e). If [the property owners] were to seek administrative relief under these procedures, a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional questions. The potential for such administrative solutions confirms the conclusion that the taking issue decided by the District Court simply is not ripe for judicial resolution." 452 U. S., at 297 (footnote omitted).

Similarly, in *Agins* v. *Tiburon, supra,* the Court held that a challenge to the application of a zoning ordinance was not ripe because the property owners had not yet submitted a plan for development of their property. 447 U. S., at 260. In *Penn Central Transp. Co.* v. *New York City, supra,* the Court declined to find that the application of New York City's Landmarks Preservation Law to Grand Central Terminal effected a taking because, although the Landmarks Preservation Commission had disapproved a plan for a 50-story office building above the terminal, the property owners had not sought approval for any other plan, and it therefore was not clear whether the Commission would deny approval for all uses that would enable the plaintiffs to derive economic benefit from the property. 438 U. S., at 136–137.

Respondent's claim is in a posture similar to the claims the Court held premature in *Hodel.* Respondent has submitted a plan for developing its property, and thus has passed beyond the *Agins* threshold. But, like the *Hodel* plaintiffs,

respondent did not then seek variances that would have allowed it to develop the property according to its proposed plat, notwithstanding the Commission's finding that the plat did not comply with the zoning ordinance and subdivision regulations. It appears that variances could have been granted to resolve at least five of the Commission's eight objections to the plat. The Board of Zoning Appeals had the power to grant certain variances from the zoning ordinance, including the ordinance's density requirements and its restriction on placing units on land with slopes having a grade in excess of 25%. Tr. 1204–1205; see n. 3, *supra.* The Commission had the power to grant variances from the subdivision regulations, including the cul-de-sac, road-grade, and frontage requirements.[9] Indeed, the Temple Hills Committee had recommended that the Commission grant variances from those regulations. App. 304–306. Nevertheless, respondent did not seek variances from either the Board or the Commission.

Respondent argues that it "did everything possible to resolve the conflict with the commission," Brief for Respondent 42, and that the Commission's denial of approval for respondent's plat was equivalent to a denial of variances. The record does not support respondent's claim, however. There is no evidence that respondent applied to the Board of Zoning Appeals for variances from the zoning ordinance. As noted, the developer sought a ruling that the ordinance in effect in 1973 should be applied, but neither respondent nor the devel-

---

[9] The subdivision regulations in effect in 1980 and 1981 provided:

"Variances may be granted under the following conditions:

"Where the subdivider can show that strict adherence to these regulations would cause unnecessary hardship, due to conditions beyond the control of the subdivider. If the subdivider creates the hardship due to his design or in an effort to increase the yield of lots in his subdivision, the variance will not be granted.

"Where the Planning Commission decides that there are topographical or other conditions peculiar to the site, and a departure from their regulations will not destroy their intent." CA App. 932.

oper sought a variance from the requirements of either the 1973 or 1980 ordinances. Further, although the subdivision regulations in effect in 1981 required that applications to the Commission for variances be in writing, and that notice of the application be given to owners of adjacent property,[10] the record contains no evidence that respondent ever filed a written request for variances from the cul-de-sac, road-grade, or frontage requirements of the subdivision regulations, or that respondent ever gave the required notice.[11] App. 212–213; see also Tr. 1255–1257.

---

[10] The Commission's regulations required that

"Each applicant must file with the Planning Commission a written request for variance stating at least the following:

"a. The variance requested.

"b. Reason or circumstances requiring the variance.

"c. Notice to the adjacent property owners that a variance is being requested.

"Without the application any condition shown on the plat which would require a variance will constitute grounds for disapproval of the plat." *Id.*, at 933.

[11] Respondent's predecessor-in-interest requested, and apparently was granted, a waiver of the 10% road-grade regulation for section VI of the subdivision. See Plaintiff's Exs. 1078, 9094. The predecessor-in-interest wrote a letter on January 3, 1980, that respondent contends must be construed as a request for a waiver of the road-grade regulation for the entire subdivision:

"I contend that the road grade and slope question . . . is adequately provided for by both the [subdivision] Regulations and the Zoning Ordinance. In both, the Planning Commission is given the authority to approve roads that have grades in excess of 10%.

"In our particular case, it was common knowledge from the beginning that due to the character of the land involved that there would be roads that exceeded the 10% slope. In fact in our first Section there is a stretch of road that exceeds the 10%; therefore I respectfully request that this letter be made an official part of the Planning Commission Minutes of January 3, 1980 and further the Zoning Approval which has been granted be allowed to stand without any changes." Defendants' Ex. 96.

Even assuming, *arguendo*, that the letter constituted a request for a variance, respondent's taking claim nevertheless is not ripe. There is no evidence that respondent requested variances from the regulations that

Indeed, in a letter to the Commission written shortly before its June 18, 1981, meeting to consider the preliminary sketch, respondent took the position that it would not request variances from the Commission until *after* the Commission approved the proposed plat:

> "[Respondent] stands ready to work with the Planning Commission concerning the necessary variances. Until the initial sketch is renewed, however, and the developer has an opportunity to do detailed engineering work it is impossible to determine the exact nature of any variances that may be needed." Plaintiff's Ex. 9028, p. 6.

The Commission's regulations clearly indicated that unless a developer applied for a variance in writing and upon notice to other property owners, "any condition shown on the plat which would require a variance will constitute grounds for disapproval of the plat." CA App. 933. Thus, in the face of respondent's refusal to follow the procedures for requesting a variance, and its refusal to provide specific information about the variances it would require, respondent hardly can maintain that the Commission's disapproval of the preliminary plat was equivalent to a final decision that no variances would be granted.

As in *Hodel*, *Agins*, and *Penn Central*, then, respondent has not yet obtained a final decision regarding how it will be allowed to develop its property. Our reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty,"

---

formed the basis of the other objections raised by the Commission, such as those regulating the length of cul-de-sacs. Absent a final decision regarding the application of *all* eight of the Commission's objections, it is impossible to tell whether the land retained any reasonable beneficial use or whether respondent's expectation interests had been destroyed.

*Penn Central Transp. Co.* v. *New York City*, 438 U. S., at 123, this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. *Id.*, at 124. See also *Ruckelshaus* v. *Monsanto Co.*, 467 U. S., at 1005; *PruneYard Shopping Center* v. *Robins*, 447 U. S., at 83; *Kaiser Aetna* v. *United States*, 444 U. S., at 175. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

Here, for example, the jury's verdict indicates only that it found that respondent would be denied the economically feasible use of its property if it were forced to develop the subdivision in a manner that would meet each of the Commission's eight objections. It is not clear whether the jury would have found that the respondent had been denied all reasonable beneficial use of the property had any of the eight objections been met through the grant of a variance. Indeed, the expert witness who testified regarding the economic impact of the Commission's actions did not itemize the effect of each of the eight objections, so the jury would have been unable to discern how a grant of a variance from any one of the regulations at issue would have affected the profitability of the development. App. 377; see also *id.*, at 102–104. Accordingly, until the Commission determines that no variances will be granted, it is impossible for the jury to find, on this record, whether respondent "will be unable to derive economic benefit" from the land.[12]

---

[12] The District Court's instructions allowed the jury to find a taking if it ascertained that "the regulations in question as applied to [respondent's] property denied [respondent] economically viable use of its property." Tr. 2016. That instruction seems to assume that respondent's taking theory was simply that its property was rendered valueless by the application of new zoning laws and subdivision regulations in 1980. The record indi-

Respondent asserts that it should not be required to seek variances from the regulations because its suit is predicated upon 42 U. S. C. § 1983, and there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action. *Patsy* v. *Florida Board of Regents*, 457 U. S. 496 (1982). The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable. See *FTC* v. *Standard Oil Co.*, 449 U. S. 232, 243 (1980); *Bethlehem Steel Corp.* v. *EPA*, 669 F. 2d 903, 908 (CA3 1982). See generally 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and

---

cates, however, that respondent's claim was based upon a state-law theory of "vested rights," and that the alleged "taking" was the Commission's interference with respondent's "expectation interest" in completing the development according to its original plans. The evidence that it was not economically feasible to develop just the 67 units respondent claims the Commission's actions would limit it to developing was based upon the cost of building the development according to the original plan. The expected income from the sale of the 67 units apparently was measured against the cost of the 27-hole golf course and the cost of installing water and sewer connections for a large development that would not have had to have been installed for a development of only 67 units. App. 191–197; Tr. 690; see also *id.*, at 2154–2155. Thus, the evidence appears to indicate that it would not be profitable to develop 67 units because respondent had made various expenditures in the expectation that the development would contain far more units; the evidence does not appear to support the proposition that, aside from those "reliance" expenditures, development of 67 units on the property would not be economically feasible.

We express no view of the propriety of applying the "economic viability" test when the taking claim is based upon such a theory of "vested rights" or "expectation interest." Cf. *Andrus* v. *Allard*, 444 U. S. 51, 66 (1979) (analyzing a claim that Government regulations effected a taking by reducing expected profits). It is sufficient for our purposes to note that whether the "property" taken is viewed as the land itself or respondent's expectation interest in developing the land as it wished, it is impossible to determine the extent of the loss or interference until the Commission has decided whether it will grant a variance from the application of the regulations.

Procedure § 3532.6 (1984). While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. *Patsy* concerned the latter, not the former.

The difference is best illustrated by comparing the procedure for seeking a variance with the procedures that, under *Patsy*, respondent would not be required to exhaust. While it appears that the State provides procedures by which an aggrieved property owner may seek a declaratory judgment regarding the validity of zoning and planning actions taken by county authorities, see *Fallin* v. *Knox County Bd. of Comm'rs*, 656 S. W. 2d 338 (Tenn. 1983); Tenn. Code Ann. §§ 27–8–101, 27–9–101 to 27–9–113, and 29–14–101 to 29–14–113 (1980 and Supp. 1984), respondent would not be required to resort to those procedures before bringing its § 1983 action, because those procedures clearly are remedial. Similarly, respondent would not be required to appeal the Commission's rejection of the preliminary plat to the Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking.

Resort to those procedures would result in a judgment whether the Commission's actions violated any of respondent's rights. In contrast, resort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed. The Commission's refusal to approve the preliminary plat does not determine that issue; it prevents respondent from developing its subdivision without obtaining the necessary variances, but leaves open the possibility that respondent

may develop the subdivision according to its plat after obtaining the variances. In short, the Commission's denial of approval does not conclusively determine whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a final, reviewable decision.

## B

A second reason the taking claim is not yet ripe is that respondent did not seek compensation through the procedures the State has provided for doing so.[13] The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S., at 297, n. 40. Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a "'reasonable, certain and adequate provision for obtaining compensation'" exist at the time of the taking. *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 124–125 (1974) (quoting *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, 659 (1890)). See also *Ruckelshaus* v. *Monsanto Co.*, 467 U. S., at 1016; *Yearsley* v. *W. A. Ross Construction Co.*, 309 U. S. 18, 21 (1940); *Hurley* v. *Kincaid*, 285 U. S. 95, 104 (1932). If the government has provided an adequate process for obtaining compensation, and if resort to that process "yield[s] just compensation," then the property owner "has no claim against

---

[13] Again, it is necessary to contrast the procedures provided for review of the Commission's actions, such as those for obtaining a declaratory judgment, see Tenn. Code Ann. §§ 29–14–101 to 29–14–113 (1980), with procedures that allow a property owner to obtain compensation for a taking. Exhaustion of review procedures is not required. See *Patsy* v. *Florida Board of Regents*, 457 U. S. 496 (1982). As we have explained, however, because the Fifth Amendment proscribes takings *without just compensation*, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action.

the Government" for a taking. *Monsanto*, 467 U. S., at 1013, 1018, n. 21. Thus, we have held that taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act, 28 U. S. C. § 1491. *Monsanto*, 467 U. S., at 1016–1020. Similarly, if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.

The recognition that a property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation is analogous to the Court's holding in *Parratt* v. *Taylor*, 451 U. S. 527 (1981). There, the Court ruled that a person deprived of property through a random and unauthorized act by a state employee does not state a claim under the Due Process Clause merely by alleging the deprivation of property. In such a situation, the Constitution does not require predeprivation process because it would be impossible or impracticable to provide a meaningful hearing before the deprivation. Instead, the Constitution is satisfied by the provision of meaningful postdeprivation process. Thus, the State's action is not "complete" in the sense of causing a constitutional injury "unless or until the state fails to provide an adequate postdeprivation remedy for the property loss." *Hudson* v. *Palmer*, 468 U. S. 517, 532, n. 12 (1984). Likewise, because the Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking, the State's action here is not "complete" until the State fails to provide adequate compensation for the taking.[14]

---

[14] The analogy to *Parratt* is imperfect because *Parratt* does not extend to situations such as those involved in *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422 (1982), in which the deprivation of property is effected pursu-

Under Tennessee law, a property owner may bring an inverse condemnation action to obtain just compensation for an alleged taking of property under certain circumstances. Tenn. Code Ann. § 29–16–123 (1980). The statutory scheme for eminent domain proceedings outlines the procedures by which government entities must exercise the right of eminent domain. §§ 29–16–101 to 29–16–121. The State is prohibited from "enter[ing] upon [condemned] land" until these procedures have been utilized and compensation has been paid the owner, § 29–16–122, but if a government entity does take possession of the land without following the required procedures,

> "the owner of such land may petition for a jury of inquest, in which case the same proceedings may be had, as near as may be, as hereinbefore provided; or he may sue for damages in the ordinary way . . . ." § 29–16–123.

The Tennessee state courts have interpreted § 29–16–123 to allow recovery through inverse condemnation where the "taking" is effected by restrictive zoning laws or development regulations. See *Davis* v. *Metropolitan Govt. of Nashville,* 620 S. W. 2d 532, 533–534 (Tenn. App. 1981); *Speight* v. *Lockhart,* 524 S. W. 2d 249 (Tenn. App. 1975). Respondent

---

ant to an established state policy or procedure, and the State could provide predeprivation process. Unlike the Due Process Clause, however, the Just Compensation Clause has never been held to require pretaking process or compensation. *Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986, 1016 (1984). Nor has the Court ever recognized any interest served by pretaking compensation that could not be equally well served by post-taking compensation. Under the Due Process Clause, on the other hand, the Court has recognized that predeprivation process is of "obvious value in reaching an accurate decision," that the "only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the [deprivation] takes effect," *Cleveland Board of Education* v. *Loudermill,* 470 U. S. 532, 543 (1985), and that predeprivation process may serve the purpose of making an individual feel that the government has dealt with him fairly. See *Carey* v. *Piphus,* 435 U. S. 247, 262 (1978). Thus, despite the Court's holding in *Logan, Parratt*'s reasoning applies here by analogy because of the special nature of the Just Compensation Clause.

has not shown that the inverse condemnation procedure is unavailable or inadequate, and until it has utilized that procedure, its taking claim is premature.

## IV

We turn to an analysis of respondent's claim under the due process theory that petitioners espouse. As noted, under that theory government regulation does not effect a taking for which the Fifth Amendment requires just compensation; instead, regulation that goes so far that it has the same effect as a taking by eminent domain is an invalid exercise of the police power, violative of the Due Process Clause of the Fourteenth Amendment. Should the government wish to accomplish the goals of such regulation, it must proceed through the exercise of its eminent domain power, and, of course, pay just compensation for any property taken. The remedy for a regulation that goes too far, under the due process theory, is not "just compensation," but invalidation of the regulation, and if authorized and appropriate, actual damages.[15]

The notion that excessive regulation can constitute a "taking" under the Just Compensation Clause stems from language in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393

---

[15] See generally F. Bosselman, D. Callies, & J. Banta, The Taking Issue 238–255 (1973); Sterk, Government Liability for Unconstitutional Land Use Regulation, 60 Ind. L. J. 113 (1984); Oakes, "Property Rights" in Constitutional Analysis Today, 56 Wash. L. Rev. 583 (1981); Stoebuck, Police Power, Takings, and Due Process, 37 Wash. & Lee L. Rev. 1057 (1980); Comment, Testing the Constitutional Validity of Land Use Regulations: Substantive Due Process as a Superior Alternative to Takings Analysis, 57 Wash. L. Rev. 715 (1982); Comment, Just Compensation or Just Invalidation: The Availability of a Damages Remedy in Challenging Land Use Regulations, 29 UCLA L. Rev. 711 (1982); cf. Costonis, "Fair" Compensation and the Accommodation Power: Antidotes for the Taking Impasse in Land Use Controversies, 75 Colum. L. Rev. 1021 (1975) (proposing that regulation be viewed as neither an exercise of the police power, nor as a taking, but as an exercise of an "accommodation" power, which would require government to offer "fair compensation" for regulation that "goes too far").

(1922).   See *San Diego*, 450 U. S., at 649 (dissenting opinion).   Writing for the *Pennsylvania Coal* Court, Justice Holmes stated: "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."   260 U. S., at 415. Those who argue that excessive regulation should be considered a violation of the Due Process Clause rather than a "taking" assert that *Pennsylvania Coal* used the word "taking" not in the literal Fifth Amendment sense, but as a metaphor for actions having the same effect as a taking by eminent domain.   See, *e. g.*, *Agins* v. *City of Tiburon*, 24 Cal. 3d 266, 274, 598 P. 2d 25, 29 (1979), aff'd, 447 U. S. 255 (1980); *Fred F. French Investing Co.* v. *City of New York*, 39 N. Y. 2d 587, 594, 350 N. E. 2d 381, 385 (1976).   Because no issue was presented in *Pennsylvania Coal* regarding compensation, it is argued, the Court was free to use the term loosely.[16]

The due process argument finds support, we are told, in the fact that the *Pennsylvania Coal* Court framed the question presented as "whether the police power can be stretched so far" as to destroy property rights, 260 U. S., at 413, and by the Court's emphasis upon the need to proceed by eminent domain rather than by regulation when the effect of the regulation would be to destroy property interests:

> "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.   As long recognized, some values are enjoyed under an implied limitation and must yield to the police power.   But

---

[16] In *Pennsylvania Coal*, homeowners sought to enjoin a coal company from mining coal under their house in violation of Pennsylvania's Kohler Act, which prohibited the mining of coal that would cause the subsidence of any home or industrial or mercantile establishment.   In defense, the coal company argued not that the regulation itself was a "taking" for which just compensation was required, but that "[i]f surface support in the anthracite district is necessary for public use, it can constitutionally be acquired only by condemnation with just compensation to the parties affected."   260 U. S., at 400.

obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases *there must be an exercise of eminent domain and compensation to sustain the act." Ibid.* (Emphasis added.)

Further, in earlier cases involving the constitutional limitations on the exercise of police power, Justice Holmes' opinions for the Court made clear that the Court did not view overly restrictive regulation as triggering an award of compensation, but as an invalid means of accomplishing what constitutionally can be accomplished only through the exercise of eminent domain. See, *e. g., Block* v. *Hirsh,* 256 U. S. 135, 156 (1921); *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 355 (1908); *Martin* v. *District of Columbia,* 205 U. S. 135, 139 (1907).

We need not pass upon the merits of petitioners' arguments, for even if viewed as a question of due process, respondent's claim is premature. Viewing a regulation that "goes too far" as an invalid exercise of the police power, rather than as a "taking" for which just compensation must be paid, does not resolve the difficult problem of how to define "too far," that is, how to distinguish the point at which regulation becomes so onerous that it has the same effect as an appropriation of the property through eminent domain or physical possession.[17]  As we have noted, resolution of that

---

[17] The attempt to determine when regulation goes so far that it becomes, literally or figuratively, a "taking" has been called the "lawyer's equivalent of the physicist's hunt for the quark." C. Haar, Land-Use Planning 766 (3d ed. 1976). See generally Bauman, The Supreme Court, Inverse Condemnation and the Fifth Amendment: Justice Brennan Confronts the Inevitable in Land Use Controls, 15 Rutgers L. J. 15, 20–32 (1983); Stoebuck, *supra,* at 1059–1079; Berger, A Policy Analysis of the Taking Problem, 49 N. Y. U. L. Rev. 165 (1974); Sax, Takings, Private Property and Public Rights, 81 Yale L. J. 149 (1971); Van Alstyne, Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria, 44

question depends, in significant part, upon an analysis of the effect the Commission's application of the zoning ordinance and subdivision regulations had on the value of respondent's property and investment-backed profit expectations. That effect cannot be measured until a final decision is made as to how the regulations will be applied to respondent's property. No such decision had been made at the time respondent filed its § 1983 action, because respondent failed to apply for variances from the regulations.

V

In sum, respondent's claim is premature, whether it is analyzed as a deprivation of property without due process under the Fourteenth Amendment, or as a taking under the Just Compensation Clause of the Fifth Amendment.[18] We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE dissents from the holding that the issues in this case are not ripe for decision at this time.

JUSTICE POWELL took no part in the decision of this case.

---

S. Cal. L. Rev. 1 (1971); Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165 (1967); Sax, Takings and the Police Power, 74 Yale L. J. 36 (1964).

[18] In light of this disposition, we need not reach the question whether the jury's verdict that respondent's expectation interest had been "taken," see n. 12, *supra,* can stand in light of the absence of any discussion in the jury instructions about the reasonableness of the alleged expectation interest. See *Ruckelshaus* v. *Monsanto Co.,* 467 U. S., at 1005–1006; *Andrus* v. *Allard,* 444 U. S., at 66. Nor do we need to reach the question whether the jury was properly allowed to determine the economic feasibility of the property, or the extent of interference with respondent's expectation interests, by reference to only that portion of the development purchased by respondent, rather than by reference to the development as a whole. Cf. *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104, 130 (1978).

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring.

The Court today discusses two methods for analyzing the constitutional injury that may result from the temporary application of government regulations denying property any economically viable use. The Court concludes that, under either approach, the respondent's claim is premature because the petitioner Williamson County Regional Planning Commission's 1981 disapproval of the respondent's preliminary plat did not constitute a final reviewable decision given the availability of a variance procedure that the respondent did not pursue. *Ante*, at 185, 199–200.

I join the Court's opinion without, however, departing from my views set forth in *San Diego Gas & Electric Co.* v. *San Diego*, 450 U. S. 621, 636 (1981) (BRENNAN, J., dissenting). Because "[i]nvalidation unaccompanied by payment of damages would hardly compensate the landowner for any economic loss suffered during the time his property was taken," I believe that "once a court establishes that there was a regulatory 'taking,' the Constitution demands that the government entity pay just compensation for the period commencing on the date the regulation first effected the 'taking,' and ending on the date the government entity chooses to rescind or otherwise amend the regulation." *Id.*, at 653, 655. As the Court demonstrates in this case, however, "the Commission's denial of approval does not conclusively determine whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a final, reviewable decision." *Ante*, at 194. In addition, "[r]espondent has not shown that [Tennessee's] inverse condemnation procedure is unavailable or inadequate, and until it has utilized that procedure, its taking claim is premature." *Ante*, at 196–197. Accordingly, I join the Court's opinion reversing the judgment of the Court of Appeals for the Sixth Circuit.

JUSTICE STEVENS, concurring in the judgment.

Zoning restrictions are a species of governmental regulation that may impair the value of private property. The impairment may occur in one of two ways. The substance of a restriction may permanently curtail the economic value of the property. Or the procedures that must be employed, either to obtain permission to use property in a particular way or to remove an unlawful restriction on its use, may temporarily deprive the owner of a fair return on his investment. For convenience, I will refer to the former category as "permanent harms" and the latter as "temporary harms."

Permanent harms fall into three subcategories. They may be impermissible even if the government is willing to pay for them.[1] They may be permissible provided that the property owner is compensated for his loss.[2] Or they may be permissible even if no compensation at all is paid.[3] The permanent harm inflicted by the zoning regulations at issue in this case is either in the second or the third subcategory. As the Court demonstrates, until all available remedies have been exhausted, all we can say with any certainty is that petitioners may be required to abandon some of their restrictions upon respondent unless they are prepared to compensate respondent for whatever permanent harm they may cause.

In most litigation involving a challenge to a governmental regulation—and this case is no exception—the government contends that the public interest justifies the harm to the property owner and that no compensation need be paid. If the government fails to convince the court that such is the case—that is, if it is not entitled to impose an uncompensated

---

[1] For example, even if the State is willing to compensate me, it has no right to appropriate my property because it does not agree with my political or religious views.

[2] See, e. g., *United States* v. *50 Acres of Land,* 469 U. S. 24 (1984).

[3] See, e. g., *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104 (1978).

permanent harm on the property owner—the court can express its ruling on the merits by stating that the regulation is invalid, or by characterizing it as a "taking." In either event, the essence of the holding is a conclusion that the harm caused by the regulation is one that the government may not impose unless it is prepared to pay for it. In my opinion, when such a situation develops, there is nothing in the Constitution that prevents the government from electing to abandon the permanent-harm-causing regulation. The fact that a jurist as eminent as Oliver Wendell Holmes characterized a regulation that "goes too far" as a "taking" does not mean that such a regulation may never be canceled and must always give rise to a right to compensation.[4]

To the extent that this case involves a claim that the respondent has suffered an unlawful permanent harm— whether it is called a "taking" or merely an invalid attempt to regulate—the Court correctly explains that the issue is not yet ripe for decision. We do not yet know whether the harm inflicted by the zoning regulations is severe enough to lead to the conclusion that the zoning regulations "go too far." We do know, however, that the process of determining how far the regulations do apply to respondent has already caused it a fairly serious harm—one that the jury calculated as worth $350,000. But that harm is in my second major category—it was a "temporary harm."

Temporary harms resulting from a regulatory decision fall into two broad subcategories: (1) those that result from a

---

[4] In *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922), Justice Holmes' opinion for the Court stated: "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." As he explained earlier in the opinion, however, all this implies is that when regulation "reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act." *Id.,* at 413. For a complete discussion of this point see Siemon, Of Regulatory Takings and Other Myths, 1 J. Land Use & Env. L. 105, 110–117 (1985).

deliberate decision to appropriate certain property for public use for a limited period of time; and (2) those that are a by-product of governmental decisionmaking. The first subcategory includes, for example, the condemnation of a laundry to be used by the military for the duration of World War II, *Kimball Laundry Co.* v. *United States*, 338 U. S. 1 (1949), or the condemnation of the unexpired term of a lease, *United States* v. *General Motors Corp.*, 323 U. S. 373 (1945)—that type of appropriation is correctly characterized as a "temporary taking." The second subcategory is fairly characterized as an inevitable cost of doing business in a highly regulated society.

Temporary harms in the second subcategory are an unfortunate but necessary by-product of disputes over the extent of the government's power to inflict permanent harms without paying for them. Every time a property owner is successful, in whole or in part, in a challenge to a governmental regulation—whether it be a zoning ordinance, a health regulation,[5] or a traffic law[6]—he is almost certain to suffer some temporary harm in the process. At the least, he will usually incur significant litigation expenses and frequently he will incur substantial revenue losses because the use of his property has been temporarily curtailed while the dispute is being resolved.

In some situations these temporary harms are compensable. Statutes authorize the recovery of some costs of litigation, including attorney's fees. Sometimes the cost of obtaining regulatory approval is budgeted in an initial development plan and ultimately recovered from consumers. But in many cases—and apparently this is one—the property owner has no effective remedy for such a temporary harm

---

[5] See, *e. g.*, *Industrial Union Dept.* v. *American Petroleum Institute*, 448 U. S. 607 (1980).

[6] See, *e. g.*, *Raymond Motor Transportation, Inc.* v. *Rice*, 434 U. S. 429 (1978).

except a possible claim that his constitutional rights have been violated. If his property is harmed—even temporarily—without due process of law, he may have a claim for damages based on the denial of his procedural rights.[7] But if the procedure that has been employed to determine whether a particular regulation "goes too far" is fair, I know of nothing in the Constitution that entitles him to recover for this type of temporary harm.

The Due Process Clause of the Fourteenth Amendment requires a State to employ fair procedures in the administration and enforcement of all kinds of regulations. It does not, however, impose the utopian requirement that enforcement action may not impose any cost upon the citizen unless the government's position is completely vindicated. We must presume that regulatory bodies such as zoning boards, school boards, and health boards, generally make a good-faith effort to advance the public interest when they are performing their official duties, but we must also recognize that they will often become involved in controversies that they will ultimately lose. Even though these controversies are costly and temporarily harmful to the private citizen, as long as fair procedures are followed, I do not believe there is any basis in the Constitution for characterizing the inevitable by-product of every such dispute as a "taking" of private property.

In this case there was a substantial dispute not only about the permissibility of the permanent harm, but also over the fairness of the procedures employed by petitioners. Respondent made a claim that its constitutional right to due process of law had been violated. Conceivably it might have prevailed on that theory if it could have proved that an unconstitutional procedure had resulted in an unnecessary delay in obtaining approval of its development plan. See *ante*, at 183, n. 6. But its proof failed on that issue. The jury

---

[7] Cf. *Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S. 1 (1978).

found "that respondent had not been denied procedural due process." *Ante*, at 182, n. 4. In my opinion, that finding completely disposes of respondent's claim for damages based on the temporary harm resulting from the controversy between respondent and petitioners over the applicability and enforceability of the various zoning restrictions involved in this case.

There is nothing in the record to suggest that petitioners have tried to condemn any part of respondent's property, either permanently or for a limited period of time. There was no "temporary taking" of the kind involved in *Kimball Laundry Co.*, *supra*, or *General Motors Corp.*, *supra*. There has been a finding that there was no violation of procedural due process. Accordingly, the award of damages cannot stand and the judgment below must be reversed.