**BAYOU DES FAMILLES DEVELOP-MENT CORPORATION, Coast Quality Construction Corporation, and Betty Jane Perrin, wife of/and Ronald J. Isaac, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 96–5086.

United States Court of Appeals, Federal Circuit.

Dec. 8, 1997.

David C. Loeb, and Jack E. Morris, Molaison, Price & Loeb, LLP, Metairie, LA, argued for plaintiffs-appellants.

Martin W. Matzen, Attorney, Environment & Natural Resources Division, Department of Justice, Washington, DC, argued for defendant-appellee. With him on brief were Lois J. Schiffer, Assistant Attorney General, Jacques B. Gelin, and Dorothy R. Burakreis. Of counsel on brief was Robert Northey, U.S. Army Corps of Engineers, New Orleans, LA.

Before NEWMAN, MAYER and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

This is a takings case in which Bayou des Familles Development Corp. ("BDF") alleges that the denial by the United States ("the Government") of a permit to build a levee effected a taking of its property without just compensation, thereby violating the Fifth Amendment of the U.S. Constitution.[1] BDF filed suit in the Court of Federal Claims in 1991. That court dismissed the case as time-

1. "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4.

barred. Because BDF failed to file suit within the statute of limitations period, we affirm.

## BACKGROUND

This takings case has been twenty-five years in the making. BDF is a real estate investment venture by a group of landowners who planned to develop some two thousand acres of land located on the west bank of the Mississippi River in Jefferson Parish. They acquired the property in 1972. Much of it is cypress-tupelo gum swamp and marsh. Their development plan called for extensive canalization, construction of a major levee, and involved blocking of certain existing waterways running through the property. The property is situated in an area where, as early as 1969, the U.S. Army Corps of Engineers ("the Corps") had been involved in discussions concerning the possible construction of a hurricane protection levee.

Within a year after acquiring the property, BDF, having obtained the necessary permissions from Jefferson Parish, began construction of the levee and canal system. Meanwhile, in October 1972, the Federal Water Pollution Control Act Amendments ("the Act") were enacted. *See* 33 U.S.C. § 1251 *et seq.* (1994) (renamed the Clean Water Act in 1977). In 1974, the Corps, having learned of the levee construction by BDF, issued a cease and desist order to BDF, and informed BDF that federal permits as provided by § 404 of the Act were required for construction of the levee and canal. The levee at that time was approximately 90% complete.

When BDF did not respond as the Government wished, the United States brought an enforcement action against BDF. *See United States v. Bayou Des Familles Dev. Corp.,* No. 75–536 (E.D.La.1975). Thereafter, in 1975 BDF applied for an after-the-fact permit. The Corps waited almost four years before issuing a denial of BDF's application for the permit on September 17, 1979. Several factors contributed to the Corps' indecision during the intervening years. One was the continuing uncertainty about the placement of the west bank flood control and hurricane protection levee. For example, in

1978 the Corps had presented a number of proposals for the hurricane levee placement to the Jefferson Parish Council. One of these proposals followed the alignment of the BDF levee.

Another consideration was the potential creation of the Jean Lafitte National Historical Park ("the park") in the vicinity of BDF's property. In 1972, Congress appropriated funds to study the creation of the park and subsequently established the park by congressional enactment in 1978. *See* 16 U.S.C. § 230 (1994). The park consists of a "core area," essentially land which the Government would acquire, and a "park protection zone" of land which would remain in private hands but the uses of which would be regulated by local authorities pursuant to the federal plan. Over 1000 of BDF's 2000 acres lie in the park protection zone.

Following the 1979 denial of its after-the-fact permit, BDF brought suit against the Corps in the federal district court for the Eastern District of Louisiana. In its suit, BDF challenged the authority of the Corps to exercise jurisdiction over its property. It sought to enjoin the Corps' denial of its permit, and to enjoin the Corps' recommendation of a levee alignment that differed from its own levee. BDF raised both constitutional and statutory challenges to the Government's actions. In 1982, the district court upheld the permit denial, rejecting all of BDF's arguments. With regard to plaintiff BDF's allegations of a Fifth Amendment taking, the district court concluded its extensive analysis of the issues by saying, "Plaintiff's exclusive remedy for claims of uncompensated takings, through delay or otherwise, if any are present in this case, rests with the Court of Claims under the Tucker Act.... Because plaintiff has an adequate remedy at law for money damages if, indeed, any taking of plaintiff's property has occurred, injunctive relief is not appropriate in this case." *Bayou Des Familles Dev. Corp. v. United States Corps of Eng'rs,* 541 F.Supp. 1025, 1042 (E.D.La.1982) (citations omitted), *aff'd,* 709 F.2d 713 (5th Cir.1983) (table), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984).[2]

**2.** In 1985, the Supreme Court affirmed the

Corps' authority under the Act over wetlands,

Eventually, at the request of Jefferson Parish, the Corps in 1986 granted to the West Jefferson Levee District a permit to construct a hurricane levee. The approved levee alignment substantially differed from BDF's original plan. The Levee District then filed in Louisiana state court an expropriation suit against BDF for the levee right-of-way. The state trial court awarded BDF something over $15 million.[3] The Louisiana Court of Appeals affirmed the judgment. The Levee District sought and obtained review by the Louisiana Supreme Court. That court concluded that the lower courts had substantially overvalued the land since the property had a low likelihood of being developable and correspondingly, a low market value. The fact that the low likelihood was a result of the government's actions did not, in the court's view, change the equation. The case was remanded to the trial court for reassessment of the damages due BDF. *See West Jefferson Levee Dist. v. Coast Quality Constr. Corp.*, 640 So.2d 1258, 1284 (La.1994), *cert. denied*, 513 U.S. 1083, 115 S.Ct. 736, 130 L.Ed.2d 639 (1995).

While the Louisiana litigation was in progress, BDF filed its suit against the United States in the Court of Federal Claims on July 25, 1991, alleging a taking and demanding just compensation under the Fifth Amendment. The Court of Federal Claims found that the alleged taking first accrued on September 21, 1979, the date when the Corps denied BDF's levee permit. The court dismissed BDF's complaint as untimely under 28 U.S.C. § 2501 since eleven years had transpired between the accrual of the cause of action and the filing of the suit. *See* 28 U.S.C. § 2501 (1994) ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the

petition thereon is filed within six years after such claim first accrues.").

## DISCUSSION

■■■ "Ripeness" in takings jurisprudence, and in particular in cases such as this, is a blend of prudential and constitutional concepts. *See, e.g., Suitum v. Tahoe Regional Planning Agency*, —— U.S. ——, —— & n. 7, 117 S.Ct. 1659, 1664 & n. 7, 137 L.Ed.2d 980 (1997).[4] In the federal courts, a dispute must have reached the point at which it can be said that the constitutional requirement of a case or controversy has been met. *See* U.S. Const. art. III, § 2; *see also Buckley v. Valeo*, 424 U.S. 1, 114, 96 S.Ct. 612, 680, 46 L.Ed.2d 659 (1976). As a prudential matter, courts are reluctant to permit themselves to be drawn into a dispute between a property owner and a land use regulatory agency until the agency has had an opportunity to evaluate the situation fully and make a considered decision. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126 (1985) ("[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury."). Property owners are also expected to exhaust any administrative remedies available to them before seeking the intervention of the courts. *See id. See generally McKart v. United States*, 395 U.S. 185, 192–95, 89 S.Ct. 1657, 1661–63, 23 L.Ed.2d 194 (1969).

The Government, as a defendant, uses the ripeness doctrine as both a sword and a shield. As a shield against suit, the Government will argue that the case is not yet ripe for judicial decision. It will explain that the disputed development proposal has not yet been fully explored; the property owner may

and its use of its permitting authority under § 404. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

**3.** The record indicates that the initial purchase price paid by BDF for the 2000 acres was $7,161,200, and that BDF had previously sold several parcels of the land, with total gross proceeds from the sales in excess of $9,000,000. *See West Jefferson Levee Dist. v. Coast Quality Constr.*

*Corp.*, 640 So.2d 1258, 1264 n. 3 (La.1994), *cert. denied*, 513 U.S. 1083, 115 S.Ct. 736, 130 L.Ed.2d 639 (1995).

**4.** For a discussion of the history and current status of the ripeness doctrine in takings law, see Thomas E. Roberts, *Ripeness after Lucas, in* After Lucas: Land Use Regulation and the Taking of Property Without Compensation 11–28 (David L. Callies ed., 1993).

still get permission to do something, even if it is less than the original proposal. The result of a successful not-yet-ripe defense is the postponement of the suit to another day, no matter what the cost to the property owner.

As a sword against recovery, the Government will argue that the case is over-ripe. The governmental decision had been made definitively, and the property owner waited too long to bring suit. Because the cause of action against the Government accrued more years ago than the relevant statute of limitations provides, the property owner is barred from a recovery on the claim. The result of a successful over-ripe defense is that the taking goes forever unrecompensed.

■ This case is of the latter kind. The Government in effect concedes that all elements of a cause of action accrued in the plaintiff's hands, but accrued more than six years before the suit was filed—six years being the relevant period under the applicable statute of limitations. *See* 28 U.S.C. § 2501 (1994). The trial court ruled as a matter of law that the Government was correct. We, however, review decisions on matters of law independently and anew. *See Applegate v. United States,* 25 F.3d 1579, 1581 (Fed.Cir.1994). The controlling question raised on appeal is, therefore, when did BDF's takings claim become ripe for adjudication, starting the statute of limitations clock.

■ The determination of when in the permit application process the point of sufficient finality is reached so as to effect a taking can be problematic.[5] Courts must be sensitive to the constitutional and prudential concerns reflected in the ripeness doctrine, while at the same time being aware that purposeful bureaucratic delay and obfuscation is not a valid basis for denial of judicial relief. *See, e.g., MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 350 n. 7, 106 S.Ct.

2561, 2567 n. 7, 91 L.Ed.2d 285 (1986) ("A property owner is of course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain [a judicial] determination.").

■ The Supreme Court has stated the general rule to be that a case is ripe when there has been a "final decision regarding the application of the [challenged] regulations to the property at issue" from "the government entity charged with implementing the regulations." *Williamson County Reg'l Planning Comm'n,* 473 U.S. at 186, 105 S.Ct. at 3116. In this case, the Corps' 1979 denial of BDF's permit could be considered a final decision for ripeness purposes. At that point, the elements of a regulatory taking would appear to have existed: (1) there had been a denial of economically viable use of the property as a result of the permit denial; (2) the property owner had distinct investment-backed expectations; and (3) the property interest taken was vested in the owner as a matter of state law, and arguably was not subject to regulation on the basis of common law nuisance principles. *See Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1179 (Fed.Cir.1994); *see also Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029–30, 112 S.Ct. 2886, 2900–01, 120 L.Ed.2d 798 (1992); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

■ Following the Corps' permit denial in 1979, BDF did not submit further permit applications. Instead, it exhaustively litigated the validity of the Corps' denial. *See Bayou Des Familles Dev. Corp.,* 541 F.Supp. 1025, 1042 (E.D.La.1982) (citations omitted), *aff'd,* 709 F.2d 713 (5th Cir.1983) (table), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984). Furthermore, in the expropriation suit brought by the Levee District against BDF, the Supreme Court of

---

5. *See, e.g.,* Thomas E. Roberts, *Ripeness and Forum Selection in Fifth Amendment Takings Litigation,* 11 J. Land Use & Envtl. L. 37, 47–56 (1995) (explaining the difference between the need for finality apart from exhausting administrative remedies, and noting the need for reapplication when it is not futile); Gregory M. Stein, *Regulatory Takings and Ripeness in the Federal*

*Courts,* 48 Vand. L.Rev. 1, 11–13, 26–32 (1995) (describing four critical moments in a federal regulatory takings claim, including both the "effective moment," defined as the point when the landowner's last required application is finally denied by the highest administrative body with power to consent, as well as the "ripeness moment," when the takings claim actually ripens).

Louisiana noted that "it is absolutely clear from the record . . . that BDF's application for § 404 and § 10 permits was denied by the Corps . . . in 1979 because of the ramifications resulting from the inclusion of landowners' land in the Jean Lafitte Park park protection zone." *West Jefferson Levee Dist.*, 640 So.2d at 1284. The court further noted that BDF would have been unable to obtain such permits at any time after 1979 for the same reason. *See id.* The Louisiana Supreme Court observed, and an owner of BDF admitted, that the market value of BDF's land had been destroyed by the 1979 permit denial. *See id.* at 1281 n. 39, 1284; *see also United States v. Bayview Homes, Inc.,* 474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985) ("Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred."); *cf. Lucas,* 505 U.S. at 1015–17, 1031–32, 112 S.Ct. at 2892–93, 2901–02 (finding that denial of a permit pursuant to a regulation that destroys all economically beneficial use of the land constitutes a taking).

BDF argues that its takings claim did not ripen until 1986, when the Corps granted Jefferson Parish a permit for a hurricane levee on an alignment other than that of BDF's original plan. BDF claims that because throughout the period of continued negotiations between Jefferson Parish and the Corps there was a possibility that a hurricane levee would be built on BDF's original alignment, its land was not rendered worthless until the matter was finally resolved. This argument mixes two separate issues. It is true that the cast of characters—BDF, Jefferson Parish, the Corps of Engineers—was largely the same in both the BDF permit denial matter and the hurricane levee project. And it is true that the two issues had many overlapping considerations. Nevertheless, as the Louisiana Supreme Court noted, the motivating forces behind the two issues were different. In the case of the BDF permit, rightly or wrongly, the inclusion of BDF's land in the Jean Lafitte Park protection zone played a major role. *See West Jefferson Levee Dist.,* 640 So.2d at 1284.

Even if the 1979 permit denial did not suffice for finality purposes, the Louisiana federal district court's 1982 decision, made in response to BDF's challenge to the permit denial, left no doubt about the legally binding nature of the Government's action. As previously mentioned, after concluding that the Corps action in denying the permit was legally valid, the trial judge instructed BDF to seek its takings remedy in the Court of Federal Claims under the Tucker Act. *See Bayou Des Familles Dev. Corp.,* 541 F.Supp. at 1042.

This is not to say that BDF was necessarily wrong in choosing to seek a solution to its problem by negotiation over the placement of the proposed hurricane levee, rather than through further litigation with the Government over the denial of the permit for the original levee. It is only to say that these were two different strategies open to BDF. The choice of one did not preclude the other, but neither did it somehow postpone BDF's obligation under the law to bring its takings claim, if one were to be brought, in a timely manner.

This decision should not be read to require the filing by property owners of premature claims, nor should it be seen to discourage a property owner's taking the time to explore with a permitting agency mutually agreeable alternatives. The permit application process often involves extensive negotiations between developers and the permitting agency. When wetlands are involved, the issues can be particularly difficult to resolve amicably.[6] This case differs from those in which an

---

**6.** Numerous articles discuss the difficulties in finding the proper balance between federal regulations to preserve wetlands and private landowners' property rights. *See, e.g.,* Virginia S. Albrecht & Paul E. Hagen, *Regulatory Takings Issues in the Context of Federal Environmental/Land Use Regulation,* 445 Practising Law Institute, Litigation and Administrative Practice Course Handbook Series 951, 967–81 (1992) (reviewing federal regulatory takings case law in the context of federal wetlands regulation). *But see* Michael K. Braswell & Stephen L. Poe, *Private Property vs. Federal Wetlands Regulation: Should Private Landowners Bear the Cost of Wetlands Protection?,* 33 Am. Bus. L.J. 179, 206–23 (1995) (suggesting that landowners whose initial permit applications have been denied should file immediately for a taking rather than negotiating or contesting the denial).

initial permit denial may be overcome by variances or appeals to higher administrative authorities. *See, e.g., Williamson County Reg'l Planning Comm'n,* 473 U.S. at 193–94, 105 S.Ct. at 3119–20 (variances); *Mac-Donald, Sommer & Frates,* 477 U.S. at 352–53 & n. 8, 106 S.Ct. at 2567–68 & n. 8 (requiring further administrative applications). BDF's wetlands had no economic value for development purposes once the Corps denied the permit. In addition, the Corps' denial was final both because no administrative appeal mechanism was provided under its regulations, *see* 33 C.F.R. § 320.1(a)(2) (1997) ("If a district or division engineer makes a final decision on a permit application in accordance with the procedures and authorities contained in these regulations ..., there is no administrative appeal of that decision."), and because the denial was based on an unchanging fact—the inclusion of BDF's lands as part of a national park pro-

tection zone. On these facts, and under the circumstances here presented, BDF's filing of its takings claim in 1991 was beyond the permissible period of the statute of limitations. The Government was within its rights to raise the statutory bar, and the trial court correctly gave judgment to the Government.[7]

## CONCLUSION

We affirm the judgment of the Court of Federal Claims.

*AFFIRMED.*

---

**7.** Plaintiff contends that the trial court erred in treating the question before it as a motion to dismiss under RCFC 12(b), rather than a motion for summary judgment under Rule 56. The Government in its motion papers styled its motion as one for summary judgment, alleging that the claims are time-barred and therefore the court lacks subject matter jurisdiction to entertain the suit. The trial court understood this as a challenge to its jurisdiction, and treated it as a motion to dismiss, apparently under Rule 12(b)(1). Ordinarily, a statute of limitations defense is an affirmative defense raised by the defendant, either initially as a Rule 12(b)(6) motion to dismiss for failure of the pleading to state a claim upon which relief can be granted (*i.e.,* the pleading shows on its face that the claim is time-barred), or later as a Rule 56 motion for summary judgment based on uncontroverted facts. Here the trial court decided the matter on the basis of facts derived from the pleadings and prior litigation of record. Defendant does not contest the fact finding as such, but rather the conclusions that were drawn from the facts of record. We conclude that the trial court could properly treat the Government's motion as a motion to dismiss under RCFC 12(b)—whether viewed as a bar to the grant of a remedy or as a bar to the court's exercise of jurisdiction over the cause, the result is the same.