James HELNORE and Constance Helnore,
Plaintiffs-Appellants,

v.

DEPARTMENT OF NATURAL RESOURCES, State of
Wisconsin, Defendant-Respondent,

Joanne KLINE and Cherie Weiloch, Defendants.

Court of Appeals

No. 04–0602. Oral argument January 27, 2005.—Decided
February 23, 2005.

2005 WI App 46

(Also reported in 694 N.W.2d 730.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Donald J. Murn, Michelle E. Martin* and *Peter W. McCombs* of *Murn & Martin, S.C.*, of Waukesha. There was oral argument by *Donald J. Murn*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Joanne F. Kloppenburg*, assistant attorney general. There was oral argument by *Joanne F. Kloppenburg*.

Before Brown, Nettesheim and Snyder, JJ.

¶ 1. BROWN, J. James and Constance Helnore own two lots that have been designated as wetlands.

They previously built a house on one lot and now want to build a house on the other. Because they have been informed by the Wisconsin Department of Natural Resources that a water quality certificate is unlikely to be granted—a condition precedent to a permit to build —they have instituted this action, claiming that the designation of their property as wetlands constituted a taking. We hold that they first have to pursue administrative remedies, beginning with an application for a WQC. The circuit court made the same ruling, and we affirm.

¶ 2. This case comes to us on appeal from a judgment on the pleadings. We review such a judgment de novo; it presents a question of law. *Commercial Mortgage & Fin. Co. v. Clerk of the Circuit Court*, 2004 WI App 204, ¶ 9, 276 Wis. 2d. 846, 689 N.W.2d 74. Because a judgment on the pleadings is essentially a summary judgment without affidavits or other supporting documents, we employ a similar methodology. *Id.*, ¶ 10. We first look at the complaint to determine whether it states a claim. *Id.* In doing so, we construe the complaint liberally, accepting as true all facts alleged and drawing all reasonable inferences from those facts in the plaintiff's favor. *See Freedom from Religion Found., Inc. v. Thompson*, 164 Wis. 2d 736, 741, 476 N.W.2d 318 (Ct. App. 1991). If the complaint states a claim, we determine whether the responsive pleading reveals any material factual issues. *Commercial Mortgage & Fin. Co.*, 689 N.W.2d 74, ¶ 10.

¶ 3. The recitation of facts that follows is based upon a liberal construction of the complaint and other facts not contested by the parties. In 1951, a subdivision plat created the Pioneer Acres Subdivision in Cedarburg, Wisconsin, including Lots 15 and 16. In 1968, the

DNR promulgated a wetlands map that designated these residentially zoned lots as wetlands. Ozaukee county, however, did not adopt the map at that time.

¶ 4. In July 1993, the Helnores were interested in purchasing Lots 15 and 16, but the Ozaukee County Department of Environmental Health (OCDEH) could not determine whether the Helnores would be able to build on these lots and advised them to contact the DNR. On July 16, two weeks before the Helnores bought the property, DNR employee Joanne Kline visited the site at the Helnores' request and informed them that no building permits from the DNR would be necessary because of the property's residential zoning; she mentioned nothing about whether the couple's planned improvements would disturb or encroach upon any wetlands. Although she sent the Helnores a follow-up letter three days later, which included a wetlands map of the area, the letter did not state that they would be precluded from building anything on the site. On July 30, the Helnores purchased the two lots.

¶ 5. After the Helnores bought Lots 15 and 16, they obtained all of the necessary permits from the town and the county and made several improvements. They built their house, a storage shed, a gazebo, a bridge, a lawn shed, and a pump house on Lot 15 and a pond spanning both lots. In 1994, some time after the Helnores had obtained their permits, Ozaukee county enacted its Shoreland Zoning Ordinance, which adopted the DNR's 1968 wetlands map.

¶ 6. The Helnores learned of restrictions on their property created by the wetlands map in October 2002. They had applied to the OCDEH in September for a sanitary permit for Lot 16 so that they could build a home for their daughter. Ozaukee county denied that permit in early October, informing the Helnores that

the reason for such denial was the classification of Lot 16 as wetlands on the DNR map.

¶ 7. Three days after the Helnores heard from the county, they received a letter from Cherie Weiloch, a DNR employee. The letter, which the complaint appears to incorporate by reference, stated that the Helnores' properties consisted "almost entirely of wetlands." It informed them that the lot on which they planned to build—i.e., Lot 16—did consist entirely of wetlands and was considered unbuildable. The letter advised that the project would require a WQC that the DNR would probably deny; the project would not meet the standards in Wis. Admin. Code ch. NR 103.[1] Weiloch further warned that after-the-fact permits might be required for already-existing improvements on the properties, including a Wis. Stat. ch. 30[2] permit for the pond and a WQC.

¶ 8. On April 14, 2003, the Helnores commenced suit against the DNR, Kline, and Weiloch (collectively, DNR), alleging that the DNR had effected a regulatory taking of their property without just compensation, contrary to article I, section 13 of the Wisconsin Constitution. The DNR moved for judgment on the pleadings, and on September 22, the circuit court held a hearing on the motion.

¶ 9. In a decision and order dated January 7, 2004, the court granted the DNR's motion. The circuit court first determined that the doctrines of sovereign immunity and primary jurisdiction precluded the Hel-

---

[1] Wisconsin Admin. Code ch. NR 103 sets water quality standards for wetlands. All references to provisions contained in ch. NR 103 are to the January 2002 version unless otherwise noted.

[2] All further references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

nores from seeking direct review in the circuit court. According to the circuit court, such review was unavailable, because the legislature had provided that parties aggrieved by the DNR's decisions must pursue judicial review through the procedures set forth in WIS. STAT. ch. 227. The Helnores' takings claim, it asserted, was not ripe because the DNR had not yet had the opportunity to make a final determination relative to the subject properties. The circuit court subsequently filed a judgment incorporating this decision and dismissed the action. The Helnores appeal.

¶ 10. We first examine the complaint to determine whether it alleges sufficient facts to constitute a takings claim. A regulatory taking occurs when a regulation or government action deprives a private landowner of "all or substantially all practical uses of a property." *Eberle v. Dane County Bd. of Adjustment*, 227 Wis. 2d 609, 622, 595 N.W.2d 730 (1999).

¶ 11. According to the Helnores, the taking occurred in 1994 when Ozaukee county passed the Shoreland Zoning Ordinance. At that point, the DNR wetlands designation directly affected the use of the Helnores' property, effectively rezoning it to preclude residential use. The Helnores cite *Mendonca v. DNR*, 126 Wis. 2d 207, 376 N.W.2d 73 (Ct. App. 1985), for the proposition that promulgating a wetlands map which affects property can be a taking. At oral argument, attempting to ascertain whether the DNR had engaged in any conduct that could constitute a taking, we inquired of the Helnores' counsel whether, in light of the fact that title had not vested in the DNR, there had been any "final act" on the part of the DNR. Counsel replied that in *Mendonca*, we held that a "wetland inventory map has a sufficiently direct effect on legally

protected interests and therefore is a final decision that is reviewable." *See Mendonca,* 126 Wis. 2d at 208. Counsel interpreted our holding to mean that adoption of a wetlands map is tantamount to a taking.

¶ 12. We disagree with the Helnores' reading of *Mendonca.* First, the issue in that case was whether a wetland inventory map had a substantial enough effect on legally protected property interests to constitute an injury for which WIS. STAT. §§ 227.15 and 227.16[3]—now WIS. STAT. §§ 227.52 and 227.53—recognized standing to seek review. *See generally Mendonca,* 126 Wis. 2d 207. Just because we recognized an injury sufficiently direct to confer standing does not mean we implicitly acknowledged this injury as a taking. We note the following language in *Mendonca* that characterized the injury at stake:

> When the DNR designates land as wetland, the county must enact a zoning ordinance in accordance with the designation. WIS. ADMIN. CODE § NR 115.05(2)(b) (1980). The code places severe use restrictions on shoreland-wetland zoning districts. WIS. ADMIN. CODE § NR 115.05(3) (1980). This mandate to rezone, coupled with the severe use restrictions, causes the petitioners direct and tangible harm . . . . [T]he petitioners here stand to suffer the direct and certain harm of severely restricted land use and property value decline.

*Mendonca,* 126 Wis. 2d at 210. A restriction can severely restrict land use and adversely affect the property's value without depriving the owner of substantially all use of the property. Thus, the language in

---

[3] Presumably, the court was referring to the 1983–84 version of the Wisconsin Statutes.

our decision does not support the proposition that merely adopting a wetland inventory map inflicts an injury rising to the level of a taking.

¶ 13. Second, the case law makes clear that a plaintiff does not have a ripe takings issue when an administrative agency merely promulgates a new regulation. It is generally not enough for a regulation to be *applicable;* rather, it must have actually *been applied* by the relevant agency. In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985) (hereafter *Williamson County*), the United States Supreme Court concluded that the respondent's Fifth Amendment takings claim was not ripe "[b]ecause respondent ha[d] not yet obtained a final decision regarding the application of . . . zoning ordinance and subdivision regulations to its property." The Court reaffirmed *Williamson County* in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001). It stated:

> [A] landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation . . . . [A] takings claim . . . depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law. As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established.

*Id.* at 620–21. Our own courts have applied the *Williamson County* rule to takings claims based on article I,

section 13 of the Wisconsin Constitution. *See Eberle*, 227 Wis. 2d at 638; *Schlieper v. DNR*, 188 Wis. 2d 318, 323, 525 N.W.2d 99 (Ct. App. 1994) ("Without an adverse ruling by an administrative body *on a specific property,* the administrative body cannot be considered to have *yet* committed a wrong regarding application of regulations to that property owner." (Emphases added.)).

■

¶ 14. Based on the foregoing discussion, the DNR did not take the Helnores' properties in 1994. Even if we assume that the county's adoption of the 1968 wetlands map is imputable to the DNR and effectively rezoned the property, neither the DNR nor the county specifically enforced the wetlands designation against the Helnores' properties. Neither entity made any sort of specific determination in 1994 with respect to what uses or activities it would permit on Lots 15 and 16 of the Pioneer Acres Subdivision.

¶ 15. The Helnores appear to have an alternative theory about when the taking of their property occurred, namely, when they received the October 2002 Weiloch letter. In discussing the takings issue, they allude to this letter at several points. Weiloch informed them in this letter that their proposed project—i.e., constructing a home for their daughter on Lot 16— would require a WQC that the DNR was *unlikely* to grant, given that the DNR considered the property, which lay on wetlands, unbuildable. We understand the Helnores to argue that the Weiloch letter constituted enforcement of the wetlands map and that such enforcement reversed previously permissible uses so as to effect a taking.

¶ 16. We reject this argument. Although this alternative theory seems to recognize the importance of specific application of wetland regulations against the subject properties, we determine that the Weiloch letter does not constitute "an adverse *ruling* by an administrative body on a specific property." *See Schlieper*, 188 Wis. 2d at 323. With respect to existing improvements, the letter merely warns that after-the-fact permits *might* be required and that the Helnores "will be required to . . . potentially conduct site restoration for activities that required Department authorization." In the meantime, they continue to reside in the home they built on Lot 15 and to retain full enjoyment of that property. As to the WQC for the Helnores' proposed construction, the letter indicates only that the DNR is unlikely to issue such a permit, based on the water quality standards in Wis. ADMIN. CODE ch. NR 103. "Might," "potentially," and "unlikely" do not "decide and explain the reach of a challenged regulation." *See Palazzolo*, 533 U.S. at 620.

¶ 17. We read the letter as merely Weiloch's prediction about the result the DNR would reach if the Helnores attempted to apply for a WQC for their proposed project. Like many "zoning" regulations, the rules applicable to property within a wetlands designation appear to be subject to the kind of variances and waivers that *Palazzolo* contemplated. *See id.* at 620–21 (Property owners must take "necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any *variances or waivers* allowed by law." (Emphasis added.)). We first note the following exchange from the oral argument with counsel for the DNR.

[Court] You were talking earlier about how . . . it's not a given that the water quality permit will be denied, that there are instances where it can be . . . once the facts are known where there can be conditions attached. Is that how you read this rule . . . to allow whoever makes this decision to grant the certification but with conditions?

[DNR's Counsel] Yes, and the conditions have to be there because . . . there are occasions when the Department believes it's in the best interest of the public and the private folks involved to provide some flexibility . . . to the extent that flexibility is allowed in the standards, and it *is*.

Sometimes small amounts of wetlands can be filled and other more valuable wetlands are preserved or enhanced. There are ways to ensure that the standards are met in most situations. There are some times where you might not be able to build at all. But I read [Wis. ADMIN. CODE § NR] 299.05 in conjunction with 299.04[4] that sets forth those standards and in (b)6.,[5] they note public interest and public rights standards set forth in chapters 30 and 31 and elsewhere in the statutes, and those standards have to include a balance of public and private rights which enables the Department to also take into account relevant equitable facts raised by the property owners. So I do believe that there is some flexibility . . . depending on the strength of the evidence the Helnores provide and present in terms of what they were told in 1993 before they bought their property.

¶ 18. Second, we note the provisions in Wis. ADMIN. CODE ch. NR 299 to which counsel refers. Chapter

---

[4] These references are to Wis. ADMIN. CODE §§ NR 299.04 and NR 299.05 (Jan. 2003). All further references to Wis. ADMIN. CODE ch. NR 299 are to the January 2003 version unless otherwise noted.

[5] Counsel refers to Wis. ADMIN. CODE § NR 299.04(1)(b)6.

NR 299 is entitled, "WATER QUALITY CERTIFICA-TION." WISCONSIN ADMIN. CODE § NR 299.04 includes several factors the DNR must consider in reviewing a WQC application, including public interest and public rights standards set forth in various parts of the Wisconsin Statutes. *See* § NR 299.04(1)(b)6. WISCONSIN ADMIN. CODE § NR 299.05 states that any denial must explain why the DNR lacks reasonable assurances that § NR 299.04 will be satisfied. Sec. NR 299.05(3)(e). It also requires grants or conditional grants of certification to include: (1) a statement that the DNR has reasonable assurances that the requirements of § NR 299.04 will be satisfied and (2) any conditions the DNR imposes. *See* § NR 299.05(3)(d). We read these provisions to mean that even if the Helnores' proposed use might not comply with ch. NR 299 "as is," the DNR may be able to impose some additional conditions or alter the proposal in such a way as to allow construction while ensuring that the Helnores' use of their property complies with the law.

¶ 19. We find further support for the notion that the DNR might allow variances as to the Helnores' parcels in WIS. ADMIN. CODE ch. NR 103, "WATER QUALITY STANDARDS FOR WETLANDS." This chapter applies to WIS. ADMIN. CODE ch. NR 299 WQC determinations. WIS. ADMIN. CODE § NR 103.06(1)(c). The DNR looks to the factors listed in WIS. ADMIN. CODE § NR 103.08(3) when it determines whether a proposal conforms to the requirements of ch. NR 103. Notwithstanding the failure of a proposal to meet those requirements, however, the DNR will find the requirements of ch. NR 103 satisfied based on § NR 103.08(4) when (1) no practicable alternative to the proposed use would avoid adverse impacts to wetlands, § NR 103.08(4)(a)1.; and (2) the nonconforming uses will not have *signifi-*

*cant* adverse effects of various sorts, *see* § NR 103.08(4)(a)2. and 3., and (c). Although the Weiloch letter states that the Helnores' proposed development does not meet the requirements of this chapter, again, we have no factual basis to conclude that Weiloch considered these factors rather than merely stated her opinion based on whatever preliminary information she had.

¶ 20. Further, as to any after-the-fact permits that the Helnores might need for their already-existent improvements, the DNR indicates it has even greater flexibility to consider equitable factors. According to the DNR,

> It is not a rigid, unforgiving process, particularly with respect to after-the-fact situations. There may be less leeway with . . . new proposals or expansions, but as to what already is there and modifications of what is there, the DNR routinely and consistently exercises the discretion allowed it as an enforcement agency and where the substantive law allows it to balance and weigh different factors.

Moreover, the DNR indicated that even if their applications are initially denied, the Helnores may present such evidence of equitable considerations *as a matter of right* at a contested case hearing. At oral argument, the DNR's counsel first cited to *R.W. Docks & Slips v. DNR*, 145 Wis. 2d 854, 429 N.W.2d 86 (Ct. App. 1988), a case in which we upheld the circuit court's authority to send the case back to the administrative law judge with instructions to consider equitable factors. Counsel then stated,

> The administrative law judges are not courts of equity. However, to the extent that the substantive law allows them to consider equitable factors, they do. And that's

why we get after-the-fact permits. That's why they—often as not—change the DNR decisions that they are reviewing based on the evidence that comes before them in the contested case hearing. So they understand the limits of their authority, but they also understand that to the extent the substantive law gives them some leeway, they have an obligation to reach fair decisions that can be upheld by the circuit courts.

Based on what we have heard, we trust that the DNR will consider any equitable facts the Helnores might present and that denial of their various permit applications is not at this point a foregone conclusion.

¶ 21. The Helnores are not left out in the cold with respect to protecting their interests just because they cannot assert a cognizable takings claim. They simply must pursue available administrative relief before resorting to the courts. The Helnores protest that the procedures in Wis. Stat. ch. 227 are inapplicable because they "do not have a traditional DNR 'decision' to review, much less appeal." We note, however, that the reason they have no "traditional DNR decision" from which to appeal through the administrative process is that they have not sought one. The doctrine of prior resort, also called primary jurisdiction, requires that they do so.

■

¶ 22. The doctrine of prior resort is similar to the exhaustion of administrative remedies doctrine, which requires that where a statute prescribes "a procedure for review of an administrative action and for judicial review of the administrative decision, the courts will consider that remedy exclusive and require that it be employed before other remedies." *Fazio v. Dep't of Employee Trust Funds*, 2002 WI App 127, ¶ 11, ¶ 11 n.9, 255 Wis. 2d 801, 645 N.W.2d 618. Courts often use

the terms interchangeably, but the former applies in cases like this one where there has been a total absence of any formal administrative proceedings. *See Nodell Inv. Corp. v. City of Glendale*, 78 Wis. 2d 416, 427 n.13, 254 N.W.2d 310 (1977); *Fazio*, 255 Wis. 2d 801, ¶ 11 n.9. Pursuant to the prior resort doctrine, courts will refuse to intervene "while there remains *any possibility* of further administrative action." *See Nodell*, 78 Wis. 2d at 428 n.13 (emphasis added); *Fazio*, 255 Wis. 2d 801, ¶ 11 n.9 (quoting *Nodell*; emphasis added).

¶ 23. We conclude that there remains a possibility of further administrative action in this case. The Helnores may apply for any required permits. If the DNR denies those permits, the Helnores may proceed pursuant to WIS. STAT. ch. 227. Pursuant to WIS. STAT. § 227.52, any administrative decision that adversely affects their substantial interests is subject to review as provided in this chapter. WISCONSIN STAT. § 227.42(1) allows any person to request a contested case hearing so long as

> (a) A substantial interest of the person is injured in fact or threatened with injury by agency action or inaction;
>
> (b) There is no evidence of legislative intent that the interest is not to be protected;
>
> (c) The injury to the person requesting a hearing is different in kind or degree from injury to the general public caused by the agency action or inaction; and
>
> (d) There is a dispute of material fact.

*See also* WIS. ADMIN. CODE § NR 299.05(5) (persons whose substantial interests may be affected by the

DNR's decision with respect to a WQC may request a contested case hearing pursuant to ch. 227).

¶ 24. The Helnores appear to contest the applicability of Wis. Stat. § 227.42(1) based on paras. (a) and (d). With respect to § 227.42(1)(a), they assert that although they have sustained a substantial injury to their property interest, as this provision contemplates, "administrative hearings are not the proper forum for addressing this constitutional taking." They further dispute that any issue of material fact exists.

¶ 25. We reject both contentions. First, we have already concluded that no taking has occurred. Denial of a WQC would threaten the Helnores' substantial interest in the use and enjoyment of their property, so Wis. Stat. § 227.42(1)(a) clearly would apply if the DNR rejected a permit application.

¶ 26. With respect to their assertion that no issue of material fact exists, the pleadings indicate otherwise. There are contested facts. For example, the parties dispute whether at the time the Helnores bought Lots 15 and 16 they had notice of restrictions on the properties due to the wetland designation and whether they relied upon representations that no such restrictions applied when they decided to purchase those properties. The DNR also indicated at the oral argument that facts regarding what the Helnores were told in 1993 before they purchased their lots would be "hotly contested." These "hotly contested" facts are material because the DNR looks at considerations of this sort in determining how much flexibility to allow for deviations to applicable regulations.

¶ 27. In sum, "the extent of the restriction . . . is not known and a regulatory taking has not yet been established." *See Palazzolo*, 533 U.S. at 621. We do not know how much of the Helnores' property will ulti-

mately be unusable. The finder of fact simply could not conclude that the Helnores have lost all substantial use of the property without knowing that information. Although we construe the allegations in a complaint liberally, we cannot predict what will happen based on incomplete information. Mere threats of a taking without compensation are not constitutional violations. To the extent that important interests in their property are threatened, WIS. STAT. ch. 227 affords them adequate means to protect those interests through the administrative process. We affirm.

*By the Court.*—Judgment affirmed.