Ronald W. **KRUSE** and Sylvia A. Kruse, Plaintiffs–Appellants,

v.

**VILLAGE OF CHAGRIN FALLS, OHIO,** Defendant–Appellee.

No. 94–3435.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 11, 1995.

Decided Jan. 29, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied March 6, 1996.

Eli Manos (argued and briefed), Michael T. Gavin, Mansour, Gavin, Gerlack & Manos, Cleveland, OH, for plaintiffs-appellants.

Edwin J. Hollern (argued and briefed), Ulmer & Berne, Columbus, OH, for defendant-appellee.

Before: MARTIN and BATCHELDER, Circuit Judges, and EDMUNDS, District Judge.*

BATCHELDER, Circuit Judge.

The Kruses appeal the district court's dismissal, for lack of jurisdiction, of their lawsuit against the Village of Chagrin Falls. Because, as we explain, the relevant facts are not in dispute and we conclude that this action is indeed ripe, we reverse the decision below and remand with instructions.

## I.

One afternoon in June of 1986, the Kruse family of Chagrin Falls returned home to

* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

discover, to their intense amazement and dismay, that their backyard was missing. The back of their property had been laid waste, and the family's house was hanging at the edge of a precipice where their lawn, trees and other landscaping had been when they left home that morning. Agents of the Village had been busily at work that day, devastating the Kruses' yard and carting off tons of soil excavated from the property, as well as the family's trees, bushes, and other plantings.

The excavated land was, long ago, part of Old State Street; however, the Village had formally vacated the street in the mid–1800s. The vacated street was disused, and the Village had permitted building on the property. When the Kruses protested the destruction of their property, the Village authorities responded that they presumed that the Village owned the vacated street (even though it had granted a building permit to the Kruses' predecessors in title to build an extension on what had been the street, and even though the Village was aware of the Kruses' occupancy). The Village had determined to commence a little roadwork across the Kruses' backyard but had not given the owners any notice of its plan to consume their yard as part of a street-widening program.

The Kruses filed a trespass action against the Village in state court seeking to quiet title to the disputed property, to recover monetary damages, and to obtain injunctive relief from the Village's destruction of and continuing trespass on their property. The Village filed a counterclaim alleging that the Kruses had encroached upon and wrongfully taken the property and seeking the removal of the family's home from the property. The Cuyahoga County Court of Common Pleas granted partial summary judgment to the Kruses, quieting title to the property in them. *See Kruse v. Village of Chagrin Falls,* Case No. 121335 (Ct. Com. Pls. (Cuyahoga Cty. Ohio) Nov. 3, 1989) (unreported). On appeal, the state appellate court affirmed the grant of summary judgment to the Kruses, holding that the Village had clearly vacated the street in 1863 and that the Kruses, as deed holders of record, were entitled to quiet title of the property. *See Kruse v. Village of*

*Chagrin Falls,* Case No. 58892, 1991 WL 125343 (Ohio Ct.App. (8th Dist.) July 11, 1991) (unreported). However, the appellate court further held that, because the Village was involved in road maintenance, a governmental function, it was immune from liability from any damage done to the Kruses' property based upon their trespass claim; the court declined to consider whether the complaint raised a constitutional claim. *See id.* The record indicates that the Ohio Supreme Court declined to accept the case for review. The state courts thus left the matter after quieting title in the Kruses to the property that the Village continues to use, but granting the Kruses neither money damages to compensate them for their loss nor injunctive relief to prevent the Village's continuing trespass on their property.

Because the Village refused to pay compensation for its appropriation of their property, the Kruses filed this lawsuit, seeking relief under 42 U.S.C. §§ 1983 and 1988 for the Village's violation of their rights under the Fifth and Fourteenth Amendments to the United States Constitution. Count II of the Kruses' complaint sought monetary relief for severe emotional and mental distress caused by the Village's taking and destroying their property without notice and an opportunity to be heard pursuant to the Ohio state statutes relative to appropriation of private property for municipal use. The Village filed its motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6), arguing that the plaintiffs "did not file an action in state court seeking money damages for Chagrin Falls' alleged taking of their property without just compensation," that "[t]heir trespass action did not constitute an inverse condemnation action" and that "their 'taking' claim is not ripe for federal review."

The district court opined that landowners in Ohio have a remedy for uncompensated takings of property for public use through inverse condemnation proceedings. Relying on *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the court held that "because plaintiffs have failed to avail themselves of the state procedure for recovering just compensation,

and because they have failed to show that this procedure is inadequate," their constitutional due process and § 1983 claims were premature and, consequently, the court lacked jurisdiction. Since it had dismissed the federal claims, the court declined to exercise pendent jurisdiction over the state-law claim for mental-distress damages, dismissing that claim without prejudice to refiling in state court. This timely appeal followed.

## II.

■ We review *de novo* the district court's dismissal of claims for lack of subject-matter jurisdiction. *Kroll v. United States,* 58 F.3d 1087, 1090 (6th Cir.1995). The Village argues, and the district court found, that *Williamson* requires a plaintiff to avail himself of state procedures for obtaining compensation, or to demonstrate that those procedures are inadequate, prior to bringing an action under § 1983, and that the Kruses' claims are not ripe because they did not pursue a state-law cause of action for inverse condemnation. We think, however, that *Williamson* does not require this result in the case at hand.

The issue in *Williamson* on which the Supreme Court granted certiorari was "whether Federal, State, and Local governments must pay money damages to a landowner whose property allegedly has been 'taken' temporarily by the application of government regulations." 473 U.S. at 185, 105 S.Ct. at 3115. The Court ultimately held that the property owner's 42 U.S.C. § 1983 action was not ripe because the property owner had neither obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to the property nor utilized the procedures Tennessee provides for obtaining just compensation. As to the first ground, the Court explained,

> Our reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. . . . [T]his Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with

reasonable investment-backed expectations. Those factors simply cannot be evaluated until the *administrative agency* has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

*Id.* at 190–91, 105 S.Ct. at 3118–19 (internal citations omitted) (emphasis added).

Second, the Court held that because the Takings Clause of the Fifth Amendment does not require pretaking compensation, so long as the state has, at the time of the taking, "a reasonable, certain and adequate provision for obtaining compensation," *id.* at 194, 105 S.Ct. at 3120 (internal quotation marks omitted) (quoting *Blanchette v. Connecticut Gen. Ins. Corps.,* 419 U.S. 102, 124–25, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974)), the taking is not complete until the state fails to provide adequate compensation. Thus, the Court in *Williamson* held,

> Under Tennessee law, a property owner may bring an inverse condemnation action to obtain just compensation for an alleged taking of property under certain circumstances. Tenn.Code Ann. § 29–16–123 (1980). The statutory scheme for eminent domain proceedings outlines the procedures by which government entities must exercise the right of eminent domain. §§ 29–16–101 to 29–16–121. The State is prohibited from "enter[ing] upon [condemned land]" until these procedures have been utilized and compensation has been paid the owner, § 29–16–122, but if a government entity does take possession of the land without following the required procedures,
>
> > "the owner of such land may petition for a jury of inquest, in which case the same proceedings may be had, as near as may be, as hereinbefore provided; or he may sue for damages in the ordinary way . . ." § 29–16–123.
>
> . . . Respondent has not shown that the inverse condemnation procedure is unavailable or inadequate, and until it has utilized that procedure, its taking claim is premature.

*Williamson,* 473 U.S. at 196–97, 105 S.Ct. at 3122.

The case before us, however, is not a claim of taking by application of governmental regulation; it is not a case in which the property owner has failed to resort to the administrative procedures which might obviate the need to address the constitutional question; it is not a case in which the state has provided a statutory procedure to obtain post-deprivation compensation. The case before us is a completed physical taking of the appellants' property by the Village, without notice and wholly in violation of the statutory requirements governing appropriation of property.

■ Of particular importance here, unlike Tennessee and a number of other states which have explicit statutory procedures governing inverse condemnation to compensate landowners whose property has been taken in violation of the Constitution and the state's eminent-domain statutes,[1] *Ohio does not have such a statute.* Ohio property owners who find themselves in the Kruses' position do not have available to them "reasonable, certain and adequate" state procedures to provide post-deprivation compensation.[2] In fact, in Ohio, the availability of remedies and the procedure to obtain compensation for property taken without regard for the state's appropriation statutes, are confusing and uncertain at best.

Ohio Rev.Code §§ 163.01–163.62, Appropriation of Property, which include provisions for appropriation (§ 163.04) and petition for appropriation (§ 163.05), provide eminent-domain procedures for the *government, prior* to taking property, to commence appropriation proceedings and compensate the owner. The Ohio statutes require municipalities to follow established procedures prior to appropriating privately-owned property for municipal use. These statutes are intended to assure that property owners will receive notice of the government's intent to appropriate their property prior to the taking, to provide for proper authorization of the government to do so, and to provide for the deprived owners to be fairly compensated for the appropriated property. *See generally* Ohio Rev.Code §§ 163.01–163.62; 719.01–719.33.

■ The Ohio Supreme Court has very recently stated that a landowner who has been deprived of his property may bring an action in mandamus to require the government to institute appropriation proceedings pursuant to Ohio's Appropriation of Property statute. *See Levin v. City of Sheffield Lake,* 70 Ohio St.3d 104, 637 N.E.2d 319, 323–24 (1994). There, the court reviewed *some of* its prior decisions, which indicated that appropriation proceedings may be compelled through mandamus, but also reiterated the stringent requirements for issuance of the extraordinary writ[3] and explained that prior to issuance of the writ to compel the commencement of appropriation proceedings, the issue of whether the petitioner's property had been appropriated had first to be deter-

---

1. Wyoming, for example, has a wonderfully clear inverse condemnation statute:

 When a person possessing the power of condemnation takes possession of or damages land in which he has no interest, or substantially diminishes the use or value of the land, due to activities on adjoining land without the authorization of the owner of the land or before filing an action of condemnation, the owner of the land may file an action in district court seeking damages for the taking or damage and shall be granted litigation expenses if damages are awarded to the owner.
 Wyo. Stat. § 1–26–516 (West 1995).

2. The Village argues that after *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), all states are required to provide an inverse condemnation remedy. The Village is mistaken. *First English* was another case raising a claim for compensation arising out of a regulatory taking. There, the Supreme Court noted, in a footnote, that the claim was ripe for review under *Williamson* because the plaintiffs had brought an inverse condemnation action and the California courts had dismissed it. 482 U.S. at 312 n. 6, 107 S.Ct. at 2384 n. 6. Further, the Court pointed out that it "ha[s] recognized that a landowner is entitled to bring an action in inverse condemnation as a result of ' "the self-executing character of the constitutional provision with respect to compensation...." ' " *Id.* at 315, 107 S.Ct. at 2386 (internal citations omitted). This does not amount to a mandate to the states to provide an inverse condemnation procedure.

3. A mandamus petitioner must prove that he is entitled to the performance of a clear legal duty and that he has no adequate remedy at law. *See, e.g., State ex rel. Citizens for Responsible Taxation v. Scioto County Bd. of Elections,* 67 Ohio St.3d 134, 616 N.E.2d 869, 871 (1993).

mined by the court in which the writ was requested. *Id.*

*Levin*, however, was not decided until 1994, well after the Kruses had begun their heretofore fruitless attempt to obtain compensation from the Village for its taking of their property. And *Levin*'s cited cases which have held that mandamus is the vehicle for compelling appropriation proceedings by public authorities, are all cases in which the court addressed a taking by the state, through the action of the Director of Highways. In *Wilson v. City of Cincinnati*, 172 Ohio St. 303, 175 N.E.2d 725, 727 (1961), the court noted that where *the state* took the property, the property owner's redress was an action in mandamus to require the Director of Highways to begin appropriation proceedings, because the state could not be sued without its consent.[4] *State v. Kauer*, 156 Ohio St. 347, 102 N.E.2d 703 (1951), involved an involuntary taking by the State through the actions of the Director of Highways, and a mandamus action filed by the property owner after he initially filed a damage action against the Director to which the Director had demurred on the basis of sovereign immunity. It is significant to note that in *Kauer*, the parties conceded that the property owner had no adequate remedy at law or equity, and, as Judge Taft pointed out in his separate concurrence, since it is elementary that no writ of mandamus will issue where the petitioner has an adequate remedy at law or equity, and since the court had not specifically decided that issue, paragraph three of the syllabus may be interpreted as deciding that issue. *Id.* 102 N.E.2d at 709.

The *Levin* court did not address at all its decision in *City of Worthington v. Carskadon*, 18 Ohio St.2d 222, 249 N.E.2d 38 (1969), a case which post-dates all of the decisions *Levin* relied upon, in which the City of Worthington took possession of property pursuant to a "quick take ordinance," prior to determination of value by a jury. There, the court held that "[t]he proper remedies for illegal entry upon one's property are criminal trespass and civil damages against the individuals entering, and injunction against the city and its agents." *Id.* 249 N.E.2d at 39.

None of these cases even mentions the remedy of inverse condemnation. The claim by the Village that *Solly v. City of Toledo*, 7 Ohio St.2d 16, 218 N.E.2d 463 (1966) holds that Ohio has such a remedy is simply incorrect.[5] Nor does our decision in *Harris v. City of Akron*, 20 F.3d 1396 (6th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994), hold that an Ohio plaintiff in the position of the Kruses is required to pursue an action in inverse condemnation before he may bring an action under 42 U.S.C. § 1983, although we concede that the reader might easily be misled on that score if he read only the publisher's headnotes. The issue of whether the plaintiff's § 1983 action was premature was neither before us nor decided by us in *Harris*. Rather, we explicitly stated that that issue was not before us,[6] but in *dicta*, citing *Williamson*, we advised the plaintiff that he could pursue "an inverse condemnation proceeding as recognized by the Ohio Supreme Court in *Solly* ..." as a prerequisite to a § 1983 action. *Id.* at 1405.

---

4. The Ohio Supreme Court specifically noted relative to the plaintiff's claim against the City of Cincinnati in that case that the plaintiff was proceeding on the authority of *Lucas v. Carney*, 167 Ohio St. 416, 149 N.E.2d 238 (1958), in which the court had held that a property owner whose property was taken for a public use by a county could institute an action against such county to have his damages assessed by a jury.

5. *Solly* held that a city official who destroys or injures private property in abating a nuisance may be liable in damages, as may the city, where there has been no judicial determination that the property is in fact a public nuisance nor an opportunity for the property owner to be heard on the subject. 218 N.E.2d at 466.

6. In *Harris*, the plaintiff did not object to the magistrate judge's dismissing his Fifth Amendment takings claim, and we expressly recognized that the takings claim was not before us. "The matter comes to us as a 'pure due process case,' not as one in which the due process claims are ancillary to any other claim." 20 F.3d at 1403. Our *dicta* regarding the takings claim appears only in the conclusion of the opinion, and only after our explicit statement that "[t]he district court, accepting the magistrate judge's recommendation, dismissed Harris' 'taking' claim as premature; it did not decide that claim on the merits." *Id.* at 1405.

700 

 We hold that Ohio affords no "reasonable, certain and adequate provision for obtaining compensation" after private property is taken by public authorities without following the mandatory pretaking appropriation procedures set out in Ohio Rev.Code §§ 163.01–163.62. Ohio's decisional law in this area is anything but certain. Ohio has no statutory provision for relief under the circumstances of this case. The fact that the State's courts recognize an action in mandamus, where the State has no mandated procedures governing inverse condemnation, cannot be equated to a "reasonable, certain and adequate provision for obtaining compensation," after the property has been physically taken in violation of the appropriations statutes. An action for the extraordinary writ of mandamus is, at best, a procedure which must be invoked in the absence of any statutory framework in an attempt to obtain wholly equitable relief for an injury already inflicted.

 The Takings Clause of the Constitution prohibits the taking of private property for public use without due process of law and just compensation. U.S. Const. amend. V. Cases involving physical occupation/invasion takings are treated differently than those involving claims of regulatory takings. *Compare, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 427 and n. 5, 102 S.Ct. 3164, 3171 and n. 5, 73 L.Ed.2d 868 (1982) ("When faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking.... The modern significance of physical occupation is that courts ... *never* deny compensation for a physical takeover. The one incontestable case for compensation ... seems to occur when the government deliberately brings it about that its agents, or the public at large, 'regularly' use, or 'permanently' occupy, space or a thing which theretofore was understood to be under private ownership.") (citations omitted); *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.") *with, e.g., Dolan v. City of Tigard,* —— U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (land use regulation case); *Williamson* (same); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 488–89 n. 18, 107 S.Ct. 1232, 1243 n. 18, 94 L.Ed.2d 472 (1987) ("[A] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by the government[.] While the Court has almost invariably found that the permanent physical occupation of property constitutes a taking, the Court has repeatedly upheld regulations that destroy or adversely affect real property interests.") (internal citations omitted).

In regulatory cases, where the government has fulfilled its obligation to provide notice to the property owner, it may be fair to place the burden of making the next move on the landowner to attempt prevention of the government action that is supposedly adverse to the owner's property interest. It may make sense to require landowners to pursue relief through administrative appeals and the mandatory injunction process when the landowners know in advance that the government is planning action that threatens their ownership of their property, especially in cases involving regulation of the use of the land, since there are generally numerous opportunities available to landowners to be heard and to attempt to prevent a proposed zoning ordinance from taking effect, or to reach a compromise with the authorities that permits some alternative use of the land. In contrast, when "a condemning authority ... occup[ies] the land in question ... [this] taking thus shifts to the landowner the burden to discover the encroachment and to take affirmative action to recover just compensation.... [The landowner is thereby] placed at a significant disadvantage by this shifting of the initiative from the condemning authority to the condemnee." *United States v. Clarke,* 445 U.S. 253, 257–58, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980) (discussing practical differences between condemnation proceedings and physical takings by governmental bodies).

These distinctions between regulatory takings and takings by physical occupation or invasion further support the conclusion that the landowners in this case are not required to pursue any further attempts in state court to obtain the compensation which the Constitution mandates they be paid. There is no question that the Village effected a taking of the Kruses' property. The state court has definitively ruled that title to the property belongs to them. The Village no longer contests either the fact that the property belongs to the Kruses or that the Village's actions constituted a taking. All that remains is for the Village to provide compensation to the Kruses for the taking, something which the Village steadfastly refuses to do. In spite of the clear dictates of the Constitution, in spite of the illegality of the Village's actions, and in spite of the fact that the Kruses filed, in accordance with some of the dictates of the Ohio Supreme Court, an action designed to obtain that compensation, the Village insists that until the Kruses file just the right kind of action to obtain the compensation to which even the Village admits they are entitled, the Village need not and will not pay.

After reviewing this record and listening to counsel at oral argument, it is obvious to us that, left to the devices of the Village's counsel, this case will become another *Jarndyce v. Jarndyce*, with the participants "mistily engaged in one of the ten thousand stages of an endless cause, tripping one another up on slippery precedents, groping knee-deep in technicalities, running their ... heads against walls of words, and making a pretence of equity...." CHARLES DICKENS, BLEAK HOUSE 2 (Oxford University Press ed. 1989) (London 1853). For nearly ten years, the Kruses have endeavored to vindicate their property rights guaranteed by the Constitution and by state statutes. The Village's actions threaten to turn the Kruse family into generations of "ruined suitors" pursuing legal redress in a system "which gives to monied might, the means abundantly of wearying out the right; which so exhausts finances, patience, courage, hope" as to leave them "perennially hopeless." *Id.* at 3–4. Enough is enough, and then some.

### III.

For these reasons, the judgment of the district court is REVERSED and the case is REMANDED with instructions. On remand, the district court will enter judgment for the Kruses and conduct a trial to award them damages. Now that the federal claims are not to be dismissed, the court may also consider whether to exercise pendent jurisdiction over the plaintiffs' state-law claim for damages resulting from severe mental distress caused by the defendant.