*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0211p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RIVER CITY CAPITAL, L.P.,

        *Plaintiff-Appellant,*

    *v.*

BOARD OF COUNTY COMMISSIONERS, CLERMONT
COUNTY, OHIO, et al.,

        *Defendants-Appellees.*

No. 05-4331

>

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 03-00289—Susan J. Dlott, District Judge.

Argued: November 29, 2006

Decided and Filed: June 6, 2007

Before: MARTIN and GUY, Circuit Judges; CARR, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** James F. McCarthy, III, KATZ, TELLER, BRANT & HILD, Cincinnati, Ohio, for Appellant. Mary Lynne Birck, CLERMONT COUNTY PROSECUTOR'S OFFICE, Batavia, Ohio, for Appellee. **ON BRIEF:** James F. McCarthy, III, KATZ, TELLER, BRANT & HILD, Cincinnati, Ohio, for Appellant. Mary Lynne Birck, CLERMONT COUNTY PROSECUTOR'S OFFICE, Batavia, Ohio, for Appellee.

---

## OPINION

---

    BOYCE F. MARTIN, JR., Circuit Judge. This case presents a familiar question in our circuit: whether a plaintiff in Ohio may proceed directly in federal court based on an alleged unconstitutional taking of his private property by a government entity, or whether he must first exhaust Ohio state remedies. We hold that state exhaustion is required, regardless of the nature of the taking, in keeping with this Court's recent decisions in *Coles v. Granville*, 448 F.3d 853 (6th Cir. 2006) and *McNamara v. Rittman*, 473 F.3d 633 (6th Cir. 2007). Because Plaintiff River City Capital

---

    [*]The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

has failed to exhaust its state avenues for relief, the case is not ripe for review, and thus we **VACATE** the order of the district court in all respects, save one minor issue that was collateral to the merits.

I

The majority of the facts in this case are not in dispute. On July 17 and 18, 2001, there was a five-year rain in Clermont County, Ohio, resulting in a flood emergency for the area. A large sinkhole began to develop at 770 Eastgate South Drive, a commercially-zoned property located in an area known as the Eastgate Square Development. The 770 Eastgate South Drive parcel is owned by River City Capital, an Ohio limited partnership. River City leases the property to the Twins Group, LLP. The Twins Group is a franchisee of Pizza Huts of Cincinnati, Inc., and operates a Pizza Hut restaurant on the property. The River City property lies between two parcels, one (to the west) containing a furniture store called Oak Express, and one (to the east) containing a McDonald's restaurant. The three contiguous properties are bordered on the north side by Route 32 (a state road), and on the south side by Eastgate South Drive (formerly a private road, now dedicated to the County).

A few weeks after the heavy rains, several interested parties attended a meeting to discuss responsibility for repair of the sinkhole. Present at the meeting were: Gayle Jacobs, River City's property manager; Carl Hartman, the Clermont County Engineer; two representatives from the Twins Group; a representative from a company called S.W.S.; and the construction manager for Oak Express. By the time of the meeting, the sinkhole had enlarged to eighteen feet in diameter and was encroaching on the Oak Express property. The Twins Group and Oak Express—i.e., the two tenants on the affected properties—agreed to hire and pay S.W.S. to investigate whether the sinkhole had been caused by a backed-up stormwater pipe running underneath the two properties. Yet when Jacobs spoke with the Twins Group about paying for any necessary repairs, Twins Group representatives specifically disclaimed responsibility beyond what they were paying for the investigation.

No repairs were made to the sinkhole, and on October 22, water backed up onto and flooded Eastgate Drive, forcing the County Engineer to close the road. This prompted the prosecuting attorney for Clermont County to send a letter to the Twins Group, dated November 2. The letter stated in relevant part:

> [I]t is our understanding that the Clermont County Engineer . . . has shared with you the fact that we searched the records and found no dedication to public use pertaining to the storm sewer easement as it runs across the following three parcels:
>
> | Parcel No. 41-31-05C-221 | McDonald's Corporation |
> | Parcel No. 41-31-05C-222 | River City Capital Limited Partnership (Pizza Hut) |
> | Parcel No. 41-31-05C-223 | Visser Real Estate & Investments (Oak Express) |
>
> Therefore, we are of the opinion that Clermont County has no legal obligation to maintain, upgrade, and/or repair such easement as it runs across the three parcels.
>
> Until the recent flooding occurred, we believed the situation to be a private matter. However, we are now concerned with the possible damage to the road and its underlying structures. In addition, we are concerned about issues of public safety and welfare.
>
> Consequently, we must insist that you take immediate action to repair the storm sewer system. We intend to hold you responsible for any and all damages resulting from this problem.

On November 12, in response both to the county prosecutor's letter and to the fact that its Pizza Hut property was in danger, River City retained Nixco Plumbing to repair the damage. Nixco discovered that a 72-inch diameter stormwater pipe, located immediately under the River City property, had corroded and collapsed. The collapse had caused a shift in the large concrete vault to which the pipe was connected. The weight of the vault had then crushed and destroyed a portion of another 72-inch pipe, this one coming from underneath the Oak Express property and connecting to the River City pipe via the vault. Nixco replaced portions of both 72-inch pipes and reoriented the concrete vault. The entire apparatus was buried approximately thirty feet underground. Nixco also had to repair portions of Oak Express's underground gas and sanitary sewer lines. When this was completed, Nixco refilled the sinkhole with new soil, resurfaced the parking lot, and hired sub-contractors to install new power lines and a light pole that were damaged by the sinkhole. River City paid $271,952 for the repairs.

The concrete vault and 72-inch stormwater pipe flowing northward out of the vault comprise the "funnel" for a 280-acre watershed. In other words, the River City property is the low point of the watershed, and thus almost every drop of stormwater runoff must at some point pass beneath it. Approximately 70% of the watershed's runoff collects in a large retention pond south of Eastgate South Drive. The water is then released in controlled fashion from the retention pond through pipes underneath the Oak Express property, ultimately connecting via a 72-inch pipe to the concrete vault. The remaining 30% of the watershed's runoff flows through a 36-inch pipe underneath the McDonald's, ultimately connecting to the opposite side of the concrete vault.[1] After flowing out of the concrete vault and northward through the 72-inch pipe along the River City/Oak Express boundary line, stormwater is released into state-controlled pipes underneath State Route 32, and these municipal pipes eventually empty the water into a lake.

II

On April 22, 2003, River City filed a complaint in federal district court against Clermont County, stating the following causes of action: (1) taking of property without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution; (2) denial of due process in violation of the Fourteenth Amendment of the United States Constitution; (3) nuisance; and (4) claim for writ of mandamus, i.e., a writ ordering the County to take responsibility for all subsequent repairs to the 72-inch stormwater pipe on the River City property.

River City's takings claim is a novel one. Its primary allegation is that Clermont County "caused a taking by permitting commercial development on adjacent land and requiring the owners of that land to provide private storm water drainage, and further by requiring the owners to do so by diverting storm water into River City's private storm sewer." D. Ct. Op., 9/9/2005, at 12. Second, River City argues that because the County took over responsibility for two roads in the watershed—Eastgate South Drive and Eastgate Square Drive—via a Dedication Plat in 1995, and because this responsibility included maintenance of the stormwater pipes under the roads, therefore the County "allowed the storm water runoff from its streets to discharge into River City's storm sewer, which caused its collapse, and that amounts to a taking." *Id*. at 14. Finally, River City argues (in the alternative) that the 1995 dedication actually effected a transfer of River City's reciprocal easement to the public; that is, the 1995 dedication transferred responsibility for the stormwater pipes under the River City property from River City to the County. *Id*. at 16-18. The nub of River City's takings claim was perhaps best encapsulated by Anthony Nickert, general partner of River City, during his testimony at trial:

---

[1]The best way to think about the concrete vault is as a "junction box" for water: two pipes come in (the 72-inch pipe via Oak Express, and the 36-inch pipe via McDonald's), and one pipe goes out.

[W]e have a piece of property that's approximately one acre, and . . . I've learned during the last couple months, that 240 or 280 acres drain into this pipe and that all of a sudden we have become responsible for that pipe, all that other drainage that goes in there.  We put a trickle into that pipe. . . .  It's not moral that they would expect me to bear the burden of all that water coming through that pipe on our property.

The County filed two motions in response: first, to exclude River City's proffered expert witness for failure to comply with disclosure provisions under Fed R. Civ. P. 26; and second, to dismiss for lack of jurisdiction because River City had failed to file the proper proceeding in state court prior to initiating its Fifth Amendment takings claim in federal court.  On December 10, 2004, the district court denied both motions.

In examining the County's motion to exclude, the district court noted that River City had failed to comply with Rule 26(a)(2)(B) within the deadline set by the court.  Expert disclosures were due on July 21, 2004, but it was not until over three weeks later, on August 13, that River City provided its disclosures in Rule 26-compliant form.  River City did supply an expert report prior to the deadline, on July 19, but River City concedes that this report was deficient under Rule 26. The district court then determined whether River City should be sanctioned for its undisputed failure to comply with Rule 26.  The court held that *exclusion* of River City's proffered expert would be inappropriate under Fed. R. Civ. P. 37(c) because River City's failure to meet some of the technical requirements of Rule 26 in timely fashion was ultimately harmless—i.e., Clermont County was not prejudiced because it still had ample time to prepare for its deposition of River City's expert.  However, the district court imposed a monetary sanction on River City, ordering it to pay the $411 incurred by the County in preparing its motion to exclude and its supporting briefs.  D. Ct. Op., 12/10/2004, at 6 ("The Court does not condone River City's disregard of the expert disclosure provisions of the Federal Rules of Civil Procedure.").

As to the motion to dismiss, the district court followed this Court's guidance in *Kruse v. Village of Chagrin Falls*, Ohio, 74 F.3d 694 (6th Cir. 1996), which suggested that for *regulatory* takings, a plaintiff must first exhaust state remedies (assuming they exist), whereas for *physical* takings, a plaintiff may file suit directly in federal court. *Id.* at 700; *see also Buckles v. Columbus Muni. Airport Auth.*, 90 F. App'x 927, 929-30 (6th Cir. 2004) (unpublished) ("[W]here the landowner simply one day finds his land physically invaded and his title transferred against his will, and yet the government refuses to pay up despite explicit requests, he need not go through Dickensian formalities to confirm the government's obvious intentions.").  Drawing a parallel to this circuit's "taking by flooding" cases, *see Cox v. Tennessee Valley Auth.*, 989 F.2d 499 (6th Cir. 1993), the district court ruled that "River City's allegations more clearly fit within the strictures of a physical takings claim," D. Ct. Op., 12/10/2004, at 10, and it allowed River City's claim to proceed.

The matter proceeded to a bench trial, held on August 3 and 4, 2005.  On September 9, the district court issued an opinion and order, ruling in favor of Clermont County on all counts.  On the takings claims, the court ruled that River City had failed to prove that the County had in any way invaded or taken River City's property.  The court similarly dismissed River City's due process claims, holding that they were subsumed within its failed takings claim.

River City now appeals, citing nineteen issues for review, including the nebulous catch-all: "Any other error as evident from the record."  Appellant's Br. at 19.  River City's nineteen "issues" appear to be no more than a request to review the district court's decisions in their entirety.  We will therefore take the liberty of focusing our review on the following two conclusions reached by the district court: (1) that River City's takings claim was ripe for federal court review; and (2) that River

City should be subject to sanction, in the form of attorney's fees, for its failure to comply with the expert disclosure provisions of Fed. R. Civ. P. 26.

### III

### A.  Ripeness / Subject Matter Jurisdiction

Among its many other proscriptions against government infringement on individual rights, the Fifth Amendment—which is made applicable against the states and their subdivisions through the Fourteenth Amendment—provides: " . . . nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V ("Takings Clause"); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005).  Read plainly, the Takings Clause—in conjunction with 28 U.S.C. § 1983, the remedial statute with which it is often paired—would seem to provide a clear hook for federal question jurisdiction under Article III.  In other words, it would seem that if a plaintiff properly alleges a taking of his private property by a municipality, he has a cognizable claim in federal court.  Although this is true, the Supreme Court has ruled that constitutional takings claims are not *ripe* for federal court review until state compensation procedures, assuming they exist and are adequate, have been exhausted:

> The recognition that a property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation is analogous to the Court's holding in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).  There, the Court ruled that a person deprived of property through a random and unauthorized act by a state employee does not state a claim under the Due Process Clause merely by alleging the deprivation of property.  In such a situation, the Constitution does not require predeprivation process because it would be impossible or impracticable to provide a meaningful hearing before the deprivation.  Instead, the Constitution is satisfied by the provision of meaningful postdeprivation process.  Thus, the State's action is not "complete" in the sense of causing a constitutional injury "unless or until the State fails to provide an adequate postdeprivation remedy for the property loss." *Hudson v. Palmer*, 468 U.S. 517, 532, n. 12, 104 S.Ct. 3194, 3203, n. 12, 82 L.Ed.2d 393 (1984).  Likewise, because the Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking, the State's action here is not "complete" until the State fails to provide adequate compensation for the taking.

*Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985).  The critical lesson to be derived from *Williamson* is that prior to exercising jurisdiction over a takings case, a federal court must first inquire into whether or not the relevant state compensation procedures are "reasonable, certain, and adequate." *McNamara*, 473 F.3d at 638 (citing *Williamson*, 473 U.S. at 194).

In Ohio, at least until recently, the inquiry into the adequacy of state compensation procedures was muddled at best, primarily because Ohio—unlike many other states—does not have "an inverse condemnation or other *direct*, statutory cause of action for plaintiffs seeking just compensation for a taking." *Coles*, 448 F.3d at 861 (emphasis added); *see also Kruse*, 74 F.3d at 698.  Instead, Ohio law provides for an action in *mandamus* to force a government actor who is seeking to take or who is actively taking private property to first bring an appropriation proceeding against the private owner. *Coles*, 448 F.3d at 861.  The courts of this circuit had for many years been uncertain as to just how "adequate" a procedure this action in mandamus really was. *See id.* at 861-65 (recounting the relevant decisional history involving Ohio takings cases).

Fortunately, this uncertainty no longer exists, because the *Coles* Court conclusively resolved the *Williamson* issue as follows:

> Today, Ohio has "reasonable, certain, and adequate procedures" for plaintiffs to pursue compensation for an involuntary taking . . . . Over the last ten years Ohio courts, including the Ohio Supreme Court, have consistently recognized mandamus as the vehicle with which to contest an involuntary taking, *no matter whether that taking is a regulatory or a physical one*, and no matter whether the public actor is a state or local entity.

*Id*. at 865 (emphasis added). *Coles* thus affirmed that the primary inquiry, at least for purposes of assessing ripeness, is whether or not an Ohio takings plaintiff has fully exhausted his state mandamus remedies before coming to federal court. If he has, then the case is ripe for our review. If he has not, then it is not. *Coles* further held that in assessing the ripeness of a takings claim, it is wholly immaterial whether the alleged taking is styled as "physical" or "regulatory." This notion is consistent with the Supreme Court's recent recognition in *Lingle* that the line between physical and regulatory takings is fuzzy at best. For example, while there are several different paths of inquiry in regulatory takings cases, "[e]ach aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539.

The *Coles* holding would also seem to comport with common sense, because determination of whether there was a "taking" in the first instance—in which is subsumed the inquiry into whether the taking was "physical" or "regulatory"—is often heavily reliant on an interpretation of state law. And if a state court correctly determines that there was no taking to begin with, there would seem to be little reason for the federal Takings Clause even to apply. *See, e.g.*, Stewart E. Sterk, *The Demise of Federal Takings Litigation*, 48 WM. & MARY L. REV. 251, 293 (2006) ("[I]f federal district courts were free to hear takings claims in the first instance, their determinations would not have the benefit of any comparable record with respect to state law. Appellate review would pass through the federal courts of appeals, bypassing altogether the state supreme courts, who remain the ultimate expositors of state property law.").

In light of these considerations, River City's continued reliance on *Kruse* (and cases citing to *Kruse*, such as *Buckles*) is simply misplaced. *Cf. Lytle v. Potter*, 480 F.Supp.2d 986, 989 (N.D. Ohio 2006) (noting that after *Coles*, much of the *Kruse* decision is no longer controlling). Furthermore, even if some of the reasoning in *Kruse* were still valid, the facts presented here may be readily distinguished. In *Kruse*, an Ohio family returned home one day "to discover, to their intense amazement and dismay, that their backyard was missing. . . . Agents of the Village had been busily at work that day, devastating the [family's] yard and carting off tons of soil excavated from the property, as well as the family's trees, bushes, and other plantings." 74 F.3d at 696. Long ago, the Kruses' backyard had been part of a street owned by the Village, but it had formally vacated the street in the mid-1800s. Oddly, the Village presumed it still owned the street, and thus chose to pave over the Kruses' yard without notice. The Kruses filed a trespass action against the Village in state court, and were victorious both at trial and on appeal. *Id.* ("[T]he state appellate court affirmed the grant of summary judgment to the Kruses, holding that the Village had clearly vacated the street in 1863 and that the Kruses, as deed holders of record, were entitled to quiet title of the property."). Yet the state courts declined to consider whether the Kruses' complaint raised a constitutional claim.

In the view of the *Kruse* court, Ohio's remedy in mandamus, whose efficacy had only been confirmed by the Ohio Supreme Court *after* the Kruses had filed suit in state court, *see Levin v. City of Sheffield*, 637 N.E.2d 319, 323-24 (Ohio 1994), was cold comfort now that the Kruses were seeking relief in the federal system:

There is no question that the Village effected a taking of the Kruses' property. The state court has definitively ruled that title to the property belongs to them. The Village no longer contests either the fact that the property belongs to the Kruses or that the Village's actions constituted a taking. All that remains is for the Village to provide compensation to the Kruses for the taking, something which the Village steadfastly refuses to do. In spite of the clear dictates of the Constitution, in spite of the illegality of the Village's actions, and in spite of the fact that the Kruses filed, in accordance with some of the dictates of the Ohio Supreme Court, an action designed to obtain that compensation, the Village insists that until the Kruses file just the right kind of action to obtain the compensation to which even the Village admits they are entitled, the Village need not and will not pay.

*Kruse*, 74 F.3d at 701.

The facts in the instant case stand in stark contrast to those in *Kruse*. Unlike the Kruses, River City appears not to have filed a trespass action, a mandamus action, or indeed any action at all with the Ohio state courts. Nor is there any reason to believe, except based on River City's alleged theories, that a "taking" attributable to Clermont County has actually occurred.[2] And given the nature of River City's takings allegations—which are quite novel in their assertion that Clermont County's development policies have somehow appropriated to the public good what was formerly an entirely private rainwater drainage system—it would seem eminently reasonable for the state courts to be given first crack at this puzzle. *See, e.g.*, Sterk, 48 WM. & MARY L. REV. 251, 300-01 ("[T]he unusual *Williamson County* ripeness doctrine tracks the unusual nature of federal takings claims, which are heavily dependent on the content of background state law. In light of that dependence, the Supreme Court's takings doctrine effectively delegates much enforcement of the Takings Clause to the state courts, and that delegation will be far more effective if takings litigation is confined to one court system rather than two.").

In other words, the plaintiffs here are very much unlike the Kruses, who had already clearly established a taking via state court proceedings, but were now being rebuffed at the door to the federal courts by "Dickensian formalities." *Buckles*, 90 F. App'x at 930. And unlike the Kruses, River City cannot claim it was unaware of the Ohio Supreme Court's ruling in *Levin*, a decision published many years prior to the events giving rise to River City's claim. *See Coles*, 448 F.3d at 863 ("The use of the writ of mandamus in such circumstances has been affirmed by the Ohio Supreme Court at least six times since 1996. Moreover, the Ohio intermediate appellate courts routinely accept mandamus actions from plaintiffs alleging a local government actor has unconstitutionally taken their property.").

In sum, River City's takings claim is not ripe, and we therefore lack jurisdiction to hear it on the merits, as did the district court below. "Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Bigelow v. Mich. Dep't of Natural Resources*, 970 F.2d 154, 157 (6th Cir. 1992) (quoting *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990)).

---

[2]River City continues to rest on the contention that because it has paid almost $272,000 in repairs, and because its property is consequently "worthless," *see* Appellant's Letter Br. at 6, a constitutionally cognizable taking must have occurred. First of all, there is no reason to believe that River City's property is valueless. Having its storm sewer pipes repaired was a significant capital expenditure, to be sure, but assuming the repair was done properly, the market value of the property should not have been substantially diminished. Second, even if the market value of River City's property were now zero, the federal Takings Clause would provide no relief if, as may well be the case, it was private—not public—action that resulted in River City's losses.

### B.  Sanctions

The only remaining question is whether we should uphold the sanctions imposed under Fed. R. Civ. P. 37 for River City's failure to comply with the expert disclosure provisions of Fed. R. Civ. P. 26.  We review a district court's imposition of sanctions under Rule 37 for abuse of discretion. *Tisdale v. Federal Express Corp.*, 415 F.3d 516, 525 (2005).  Because River City *conceded* that its initial expert disclosure did not comply with Rule 26, we fail to see how the district court could possibly have abused its discretion under Rule 37 by ordering River City to pay the $411 in fees incurred by the County in preparing and supporting its motion to exclude.

River City now maintains, however, that in light of our decision to vacate the district court's order with respect to the takings claim, we should similarly vacate the district court's order with respect to sanctions.  Appellant's Letter Br., 1/22/2007, at 6-7.  We respectfully disagree.  The Supreme Court has addressed exactly this issue, albeit in the Rule 11 sanctions context:

> A final determination of lack of subject-matter jurisdiction of a case in a federal court, of course, precludes further adjudication of it.  But such a determination does not automatically wipe out all proceedings had in the district court at a time when the district court operated under the misapprehension that it had jurisdiction.

*Willy v. Coastal Corp.*, 503 U.S. 131, 137 (1992).  We see no reason why a district court's issuance of sanctions under Rule 11 (as in *Willy*) as opposed to Rule 37 (as here) should make any difference in our analysis.  In both cases, "[t]he District Court order which the petitioner seeks to upset is one that is collateral to the merits."  *Id*.  Just because a federal court is later found to lack subject matter jurisdiction in a particular matter does not give litigants a free pass with respect to any and all prior indiscretions they may have committed before the court.  "The interest in having rules of procedure obeyed . . . does not disappear upon a subsequent determination that the court was without subject-matter jurisdiction."  *Id*. at 138.  Accordingly, we affirm the district court's imposition of sanctions against River City, and this aspect of the district court's opinion is not vacated.

### IV

Our recent decision in *Coles* now requires us to **VACATE** the district court's order on the merits of River City's takings claim.  As River City clearly has not exhausted the "reasonable, certain, and adequate" state-court remedies in Ohio for its alleged taking, the case is not yet ripe for federal-court review and therefore must be dismissed for lack of jurisdiction.

As discussed in Part III-B, however, we do not vacate, but rather **AFFIRM** the district court's order to impose sanctions on River City for failure to comply with the expert witness disclosure provisions of Fed. R. Civ. P. 26.